[624 NYS2d 144]

**ALICE WRIGHT, as Administratrix of the Estate of RENITA Y. WRIGHT, Deceased, Respondent, v NEW YORK CITY HOUSING AUTHORITY, Appellant, et al., Defendant.**

First Department, March 23, 1995

**APPEARANCES OF COUNSEL**

*Richard E. Lerner* of counsel, New York City *(Anthony J. Mercorella* and *Harry P. Brett* on the brief; *Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys), for appellant.

*Nathan Belofsky* of counsel, Brooklyn *(Headley & Zeitlin,* attorneys), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

In the early morning hours of February 15, 1985, 20-year-old Renita Wright was raped and strangled to death. Her body was found later that day at the door leading to the roof of 1357 Washington Avenue, a 20-floor building in a Bronx housing project owned and operated by the New York City Housing Authority. The deceased, who had resided with her mother, the administratrix of her estate and plaintiff herein, on the 11th floor of the building, had gone out with a female companion earlier that evening, at approximately 8:15 P.M. She never returned to the apartment. In this action, plaintiff alleges that the Housing Authority failed to meet its duty of care with regard to the maintenance, inspection and repair of the building's elevators, door locks and stairwells and that this failure, viewed against a backdrop of prior violent crimi-

nal activity at the premises, was a proximate cause of the deceased's rape and murder.

The matter is before us on the Housing Authority's appeal from the denial of its motion for summary judgment dismissing the complaint. The following facts emerge from the supporting and opposing affidavits submitted on the motion. The building in question had a main and side entrance. The main entrance had neither a functioning locking nor intercommunication system for several years. According to plaintiff, the stairwells were unlit and almost always dark and, for at least several months prior to the murder, both of the building's elevators were operating in a defective manner. They would usually stop at only the 17th and 20th floors, giving tenants the option of walking up the stairs from the lobby, taking the elevator to the 17th or 20th floor and walking up or down the stairway, as the case may be, to their destination or attempting to stop the elevator at their floor by using the emergency controls, a method fraught with danger. The deceased's practice was to take the elevator to the 17th or 20th floor and walk down to her family's 11th floor apartment. According to the Housing Authority, the front door lock had been repeatedly broken and the hallway and stairway light bulbs stolen by the tenants or vandals.

The building in question as well as the other buildings in the project had a history of criminal activity, often violent, including at least four rapes, a shooting and an incident where a woman was thrown off the roof. According to plaintiff, the building's stairways and roof were also a haven for drug abusers and dealers.

On the night in question, the deceased's mother and brother heard a scream which seemed to be coming from the stairwell outside their apartment. The deceased's mother was sufficiently concerned to send her son into the stairway to check on the safety of a visitor who had just left the apartment. The son did not see anyone in the stairway. Five minutes after the scream, the deceased's boyfriend came to the apartment door asking for her. The next day, while searching for his sister, the deceased's brother observed coins and tokens lying in the stairwell outside the apartment.

In opposition to the motion, plaintiff submitted the affidavit of a security consultant who, based on a visit to the building more than 8½ years after the incident and a review of the facts made available to him, stated, "with a reasonable

degree of certainty," that the perpetrator "almost certainly" gained access to the building through the unlocked front entrance doors and that defective elevators forced the deceased, on the night of her murder, to use dark and unlit stairwells, which afforded a hiding place for the perpetrator, who "almost certainly" initially assaulted the deceased in the stairwell at the 11th floor and subsequently dragged her to the roof. On the basis of these findings, the expert concluded that the murder would not have occurred if the front entrance locks were working, the elevators had been functioning properly and the stairwells properly illuminated. Without any discussion of the Housing Authority's claim that, absent a showing as to how the assailant(s) gained entry into the building, plaintiff could not establish proximate cause as a matter of law as to the defective front entrance door lock, the IAS Court denied the motion, finding triable issues as to the foreseeability of the incident. We reverse.

Insofar as plaintiff predicates her claim on a lack of security, based on an allegedly broken entrance door lock, it is incumbent upon her, on the issue of proximate cause, to demonstrate that the assailant was an intruder and not one of the building residents or a guest thereof. (See, Dawson v New York City Hous. Auth., 203 AD2d 55; Kistoo v City of New York, 195 AD2d 403; Pena v New York City Hous. Auth., 195 AD2d 395.) In Dawson, the most recently decided case on this issue, this Court, in dismissing the complaint, stated, "[T]he failure to provide locks on outer doors is only pertinent as an alleged proximate cause if there is evidence to support a finding that the assailant was 'an intruder * * * with no right or privilege to be present there'." (203 AD2d, supra, at 55, quoting Miller v State of New York, 62 NY2d 506, 509.) In the absence of such proof, the trier of fact can only speculate that the perpetrator's presence in the building was attributable to defendant's negligence.

Plaintiff has presented absolutely no factual support for her contention that the assailant was an intruder who gained entry to the building in question by virtue of the unlocked entrance doors. Indeed, her expert does not even state that the crime was committed by someone who did not reside in the building or was not authorized to be on the premises. Instead, he states that the assailant entered the building through the unlocked front doors, an observation that, given the nonfunctioning state of the front entrance lock, quite properly could be made as to those authorized to enter as well

as those who were not. In this regard, it is clear that a landlord is under no duty to safeguard a tenant against attack by another tenant "since it cannot be said that the landlord had the ability or a reasonable opportunity to control [the assailant]." *(Blatt v New York City Hous. Auth.,* 123 AD2d 591, 592, *lv denied* 69 NY2d 603; *Gill v New York City Hous. Auth.,* 130 AD2d 256.)

Plaintiff's other claims of negligence are equally without merit. While a victim's compelled use of the stairs as a result of the lack of a properly operating elevator may serve as a proximate cause of a plaintiff's injuries *(cf., Public Adm'r of County of N. Y. v Fifth Ave. Dev. Corp.,* 180 AD2d 473), as will a failure to illuminate if it leads to a criminal incident *(see, Loeser v Nathan Hale Gardens,* 73 AD2d 187), the proof offered here falls woefully short of the mark. The affidavit of plaintiff's expert stating that the murder would not have occurred if the elevators were working properly and the stairwells had been properly illuminated consists of bald conclusions calculated to show fault but is devoid of any evidentiary showing based on knowledge of the facts. The expert does not indicate that he spoke to any witnesses or police personnel assigned to the case. He does not mention having reviewed police reports or any other investigatory materials. It is difficult to fathom how he could reach any conclusions as to how the deceased met her death from a visual inspection of the stairway more than 8½ years after the crime.

It is well settled that an expert's affidavit which contains bare conclusory assertions is insufficient to defeat summary judgment. *(Amatulli v Delhi Constr. Corp.,* 77 NY2d 525, 533; *Zuckerman v City of New York,* 49 NY2d 557, 562.)* While an expert may, in his area of expertise, reach conclusions beyond the ken of the ordinary layman, he may only do so on the basis of the established facts. He may not himself create the facts upon which the conclusion is based. Here, there is no evidence from which to conclude that the deceased, on the night in question, did, in fact, take the elevator to the 17th or 20th floor, as the case may be, and use the stairway to get to her 11th floor apartment or that any defective lighting in the stairway in any way contributed to her death. For all that appears, the deceased may have met her death at the hands of someone known to her or someone who confronted her outside her own apartment or in any of the public hallways and then dragged her into the stairway.

■ Nor is plaintiff entitled, as she argues, citing *Noseworthy v City of New York* (298 NY 76), to the benefit of a lesser degree of proof because this is a death case. The principle which underlies *Noseworthy,* where the decedent was run over by a subway train, "is based on the 'consideration' mentioned in *Griffen* v. *Manice* (166 N. Y. 188, 193-194) 'that where the management and control of the thing which has produced the injury is exclusively vested in the defendant, it is within his power to produce evidence of the actual cause that produced the accident, which the plaintiff is unable to present.' " (298 NY, *supra,* at 80-81.) Unlike *Noseworthy,* where "no one except the motorman knew what took place * * * in that deserted subway station" *(supra,* at 81), the identity of the assailant in the instant case and the manner in which he gained access to the building and confronted the deceased is, from all that appears in this record, as unknown to defendant Housing Authority as it is to plaintiff. Thus, since plaintiff and defendant are similarly situated insofar as accessibility to the facts of the deceased's death is concerned, the *Noseworthy* doctrine has no application.

Accordingly, the order of the Supreme Court, Bronx County (Barry Salman, J.), entered July 12, 1994, should be reversed, on the law, without costs or disbursements, and defendant's motion for summary judgment dismissing the complaint granted. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint, without costs.

ROSENBERGER, NARDELLI and WILLIAMS, JJ., concur.

Order, Supreme Court, Bronx County, entered July 12, 1994, reversed, on the law, without costs or disbursements, and defendant's motion for summary judgment dismissing the complaint granted.