[No. B091339. Second Dist., Div. One. Mar. 11, 1996.]

LESLIE G., Plaintiff and Appellant, v.
PERRY & ASSOCIATES et al., Defendants and Respondents.

476

## COUNSEL

Lewis, Goldberg & Ball, Michael L. Goldberg, Fletcher & Roit and Natasha Roit for Plaintiff and Appellant.

Veatch, Carlson, Grogan & Nelson, Thomas M. Phillips, Greines, Martin, Stein & Richland, Irving H. Greines and Barbara W. Ravitz for Defendants and Respondents.

## OPINION

**VOGEL (Miriam A.), J.**—Leslie G. was raped in the garage of her supposedly "secure" apartment building. She sued the building's owners (but not the rapist, who was never caught and who, most likely, would in any event be judgment-proof), contending the owners were negligent because they failed to repair a broken security gate and that their negligence caused her rape. The trial court granted the owners' motion for summary judgment and Leslie appeals, contending the landlords owed a duty to her and that their negligence was the cause of her rape. The landlords insist that, on the facts of this case, no duty was owed but contend that, even assuming duty and breach, their negligence was not the cause of Leslie's rape. Because we agree with the landlords on the causation issue, we assume without deciding that a duty was owed and hold that, as a matter of law, an expert's uncorroborated speculation is insufficient to establish causation.

### FACTS

Leslie arrived home at about 2 a.m. on June 15, 1990, used her security access card to enter the apartment building's underground garage, drove down a ramp and pulled into her parking space. As she got out of her car,

Leslie was attacked by an unknown assailant who grabbed her by the throat, beat her into submission, brutally raped her, and then fled, never to be caught.

Leslie sued Mirion Bowers, Geraldine Bowers and Perry & Associates (collectively Bowers), the owners of her apartment building, alleging negligence and "premises liability" arising from a failure to repair a broken security gate. Bowers answered, conducted discovery, and then moved for summary judgment, contending that he owed no duty to Leslie to prevent a rape because there had been no prior similar incidents on the premises, that his negligence was not the cause of the rape and that, in any event, Leslie was not entitled to recover punitive damages as prayed in her complaint. By the time the motion was fully briefed by both sides, this is what the evidence did (and did not) establish:

Leslie and her roommate, Eryn B., rented their apartment in late 1988 because they wanted a "security building" with controlled access and they were assured by the building's managers (and saw for themselves) that this particular building had several security features, including underground parking secured by an automatic gate which required an access card for entry (the standard sort of iron gate that rises up from the ground to permit a car to enter, then closes after the car has entered). From the time Leslie and Eryn moved in until the time Leslie was raped, there were no prior rapes or violent crimes in the garage, but there were over a dozen auto burglaries reported to the police during that period and there were some (but apparently not many) violent crimes in the surrounding area.[1] While Bowers may not have been aware of every reported crime, he was aware of at least some of them, as were the building's managers and maintenance staff.

In late 1989 and early 1990, Bowers received calls from six or more tenants complaining that the security gate was not functioning properly, and Eryn complained several times to the manager. It seems that sometime in January or February, a car ran into the gate and, from that time on, the gate

---

[1]There is some conflict in the evidence about the kinds of crimes and the frequency with which they occurred. According to Bowers' moving papers, the only "assaultive type incidents" on the actual premises of the building were between cohabiting or formerly cohabiting tenants (with one exception, a fight involving a tenant and a manager's daughter). According to Leslie's papers, "[t]here were 13 prior crimes in the garage within approximately two years prior to the rape, some of which included smashing of car windows (one incident involved the use of a cinder block), tire slashing, burglaries from motor vehicles, thefts, and so on. There was also a consistent pattern of drug-related activity going on at the premises of which the owners were aware." Leslie's expert, whose testimony is discussed below, described the location of the building as a "high crime area." Although the record is not altogether clear, it appears that at least some of the auto burglaries and other on-premises incidents occurred at times when the security gate was broken, and others occurred when it was working.

"wouldn't shut fully," leaving a three-foot space between the ground and the bottom of the gate. Sometimes the gate would simply stick "in the open position." Although it is undisputed that the gate was serviced, there remains a dispute about the effectiveness of that "service" and the parties do not agree about the condition of the gate on the night Leslie was raped. According to Leslie, the gate did not close all the way that day. According to the police officer who responded to the scene after the rape, the gate was open when the officer arrived (but she could not say one way or the other whether it was broken). According to Bowers, the gate was working when he visited his building the day after the rape. Two weeks later, however, the repair service returned because the gate was not working.

Leslie's security expert, Chris E. McGoey,[2] testified at his deposition that the apartment is in a "high crime area," a district ranked sixth out of 59 in North Hollywood, that the building "was designed to be a security building in that there were wrought iron security gates installed in the garage in or about 1987," that the building had in the past been "marketed as [a] 'security complex' to attract tenants to the building as opposed to some other building that didn't have those security amenities," that the "security gates were a critical part of the operation of the apartment complex" and that, therefore, "the gate should have been maintained on a regular basis by someone . . . trained and skilled in repairing the gates . . . ." Based on the police report, Eryn's deposition testimony, Leslie's statements, and telephone message slips reflecting calls about the gate, he continued:

"I think the nature of the parking structure . . . being underground or below the building, being remote and isolated, provided a potentially hazardous environment for people that would have to drive in underground, essentially, and park there at night, unless the security gates were properly functioning. [¶] The facts of this case seem to indicate that the security gate to the lower garage was defective on the evening [of Leslie's rape] in that it would not fully close and allowed the [rapist] to gain access to the parking structure and lie in wait for [Leslie] to pull into her parking space. [For a month or two before the rape,] there was no one on site on a daily basis in a management capacity to inspect, test, receive tenant complaints [or] respond to any defects that might have existed in the security gates.

"It's my opinion that an on-site manager is required in a property of this size . . . . I think had someone been on the premises acting in that capacity,

[2]McGoey has the usual credentials for someone testifying in this type of case. He has an A.A. degree in Police Science, a B.S. degree in Criminal Justice Administration, and at the time of his deposition was working on a Masters degree in the same major. According to his resume, he conducts security surveys where violent crime is a problem, provides advice on how to reduce the risk of crime, conducts "crime demographic analysis and vulnerability assessments," and testifies as an expert witness in litigation involving allegations of inadequate security, negligence, false arrest and the use of force.

they would have become aware of the defective condition of the gate and had an opportunity to make the repair. . . . [¶] I think when representations are made to tenants regarding the safety of a building and the security amenities of a building, they need to be maintained. Absence of a manager and absence of inspection, maintenance and follow-up during that time period I believe is a breach of that responsibility. I think based on my experience with rape cases in the rental housing industry, it's my opinion that the assailant was waiting in the garage prior to [Leslie] arriving and . . . presented himself to her once he realized she was alone and there were no other witnesses in the garage.

". . . *Typically* the assailant will have cased the location in advance, will know where the escape routes are and will wait for the opportunity and wait for the victim to come to him or provide the opportunity for him to attack the victim. [¶] *The fact that the assailant attacked [Leslie] in the parking structure in her vehicle indicates to me he knew that either from prior experience or prior time* at this location that he would be undisturbed during that period of time, that there was a very small chance of being observed by anyone, and that he would have an excellent ability to escape, if necessary. *I believe he selected this location because of the conditions that he found, one being an open gate providing him access. Too, the isolated, remote nature of the structure, the opportunities to hide, potentially a light being out, and escape routes out of the building. I think they all contributed to his selection of this particular building and the attack on [Leslie].*" (Italics added.)

Of course, McGoey conceded, as he had to, that he did not know how the rapist gained entry into the garage or whether he was admitted by a tenant.[3]

Based on this evidence, the trial court granted Bowers' motion for summary judgment, finding that, in the absence of any prior similar incident, it was unforeseeable that a rape would occur. As the trial court put it, "[a]lthough [Leslie] presented evidence of thirteen prior crimes that occurred in the . . . apartment building within the two years prior to her rape, these incidents involved vandalism, theft and drug-related activities, not rape or other violent or assaultive acts. . . . Thus, [Leslie's] evidence failed to

---

[3]In addition to the security gate, there are three other entrances to the parking garage. Two of them are locked doors accessible from adjacent locked gated patio areas which are accessible only with keys. The third means of access is through the locked main door to the apartment building, down the lobby, through a door next to the elevator and down a flight of stairs to the garage. There is evidence that all of these doors were locked at the time of the rape and no evidence that any door was unlocked. Although Leslie construes this to mean the rapist must have entered through the broken security gate, her own expert (as noted) conceded that he didn't know whether another tenant let the rapist into the building. In addition, Eryn testified that tenants often propped these doors open with doormats. Of course, there is also the possibility that the rapist had found a lost key.

show any prior similar incident and is not sufficient to raise a triable issue of material fact." Leslie appeals from the judgment thereafter entered.

DISCUSSION

I.

■ To recover on a negligence theory, a plaintiff must prove duty, breach, causation and damages. (Rest.2d Torts, §§ 281, 283, pp. 4, 12; *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 426 [20 Cal.Rptr.2d 97]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, pp. 60-61.) In *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207], our Supreme Court addressed the issue of duty, refined the "totality of the circumstances" rule articulated in *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112 [211 Cal.Rptr. 356, 695 P.2d 653], and adopted the following test for determining the scope of a landowner's duty to secure public areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures:

"[T]he scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. . . . ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. . . . On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." . . .' . . . Or, [stated differently], duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures. . . ." (*Ann M. v. Pacific Plaza Shopping Center, supra*, 6 Cal.4th at pp. 678-679.)

■ In our case, the evidence suggested the harm could have been prevented by the most simplistic means—fixing an existing security gate. The trial court nevertheless held that the absence of prior assaultive crimes in the building meant Leslie's rape was not sufficiently foreseeable and that, therefore, no duty was owed. On this appeal, Leslie contends the absence of prior identical offenses is immaterial and that the trial court should have considered the auto burglaries in the building and the general crime rate in the area sufficient to establish the foreseeability element of duty. Not surprisingly, Bowers contends the trial court's analysis was correct. However interesting this issue may be in the context of a supposedly "secure" apartment building, we do not address it because, even assuming duty, the

element of causation is lacking in this case. (But see *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 802-803 [142 Cal.Rptr. 487]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 501-503 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447]; *Pamela W.* v. *Millsom* (1994) 25 Cal.App.4th 950, 959-960 [30 Cal.Rptr.2d 690]; *Eads* v. *Marks* (1952) 39 Cal.2d 807, 810-811 [249 P.2d 257]; *Bloomberg* v. *Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 575 [207 Cal.Rptr. 853].)

## II.

Bowers contends that, even assuming he owed a duty to Leslie and assuming further that there was a breach of that duty, the summary judgment should be affirmed because, as a matter of law, there is no causal connection between his breach and the harm to Leslie. We agree.

### A.

In California, the causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty (his negligent act or omission) was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872]; *Nola M.* v. *University of Southern California, supra*, 16 Cal.App.4th at p. 427.) In the context of this case, the causation analysis is unaffected by the fact that the assailant's conduct was criminal and not merely negligent. Stated in traditional terms, the assailant's attack is not a superseding cause and it does not, in itself, relieve the defendant of liability. As our Supreme Court has explained, if the likelihood that a third person may act in a particular manner is " 'one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.' " (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58 [192 Cal.Rptr. 857, 665 P.2d 947], quoting Rest.2d Torts, § 449, p. 482; *Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; *Nola M.* v. *University of Southern California, supra*, 16 Cal.App.4th at p. 427.)

The question, therefore, is whether there is evidence supporting Leslie's claim that Bowers' negligence was the legal cause of her injuries. If there is none, the summary judgment must be affirmed as a matter of law. (*Nola M.* v. *University of Southern California, supra*, 16 Cal.App.4th at pp. 427-428; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 207 [223 Cal.Rptr. 645].)

### B.

Leslie's expert testified that, in his opinion, the rapist was attracted to and entered the garage because of the broken gate. As McGoey put it, the rapist

"selected this location because of the conditions that he found, one being an open gate providing him access. Too, the isolated, remote nature of the structure, the opportunities to hide, potentially a light being out, and escape routes out of the building. I think they all contributed to his selection of this particular building and the attack on [Leslie]." Leslie asks us to take this testimony, combine it with the evidence suggesting the other garage access doors were *probably* locked on the night of her rape, and conclude that she has raised a triable issue of material fact about whether, but for Bowers' negligence, the rape would not have occurred. That we cannot do.

### 1.

Although this case is before us on appeal from a summary judgment, the burden of proof on the causation issue was on Leslie. Under the current version of the summary judgment statute, a moving defendant need not support his motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may (through factually vague discovery responses or otherwise) point to *the absence of evidence to support the plaintiff's case.* When that is done, the burden shifts to the plaintiff to present evidence showing there is a triable issue of material fact. If the plaintiff is unable to meet her burden of proof regarding an essential element of her case, all other facts are rendered immaterial. (Code Civ. Proc., § 437c, subd. (o)(2); *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653]; *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 748-749 [41 Cal.Rptr.2d 719]; *Hunter* v. *Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282, 1286-1288 [44 Cal.Rptr.2d 335].)

Here, Bowers relied on the deposition testimony of the investigating police officers and of McGoey (Leslie's expert) to point to the absence of evidence of causation (they testified they did not know how the rapist entered or left the garage). Accordingly, it became Leslie's burden to present evidence showing there was at least a triable issue of material fact about how the rapist entered the garage.

### 2.

From the evidence presented by both sides, we are satisfied that causation was not—and could not be—established in this case.

 To prevail in a negligence action, the plaintiff must establish every essential element of her case by a preponderance of the evidence. (Evid. Code, § 115 [unless a different degree of proof is required, a "preponderance of the evidence" is sufficient].) "Preponderance of the evidence" is usually

defined in terms of "probability of truth," for example as evidence that, " 'when weighed with that opposed to it, has more convincing force and the greater probability of truth.' " (1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 157, p. 135; BAJI No. 2.60 (8th ed. 1994).) In deciding whether a plaintiff has met her burden of proof, we consider both direct and circumstantial evidence, and all reasonable inferences to be drawn from both kinds of evidence, giving full consideration to the negative and affirmative inferences to be drawn from all of the evidence, including that which has been produced by the defendant. (*Williams* v. *Barnett* (1955) 135 Cal.App.2d 607, 612 [287 P.2d 789]; 3 Witkin, Cal. Evidence, *supra*, Introduction of Evidence at Trial, §§ 1795-1797, pp. 1752-1756.)

We will not, however, draw inferences from thin air. Where, as here, the plaintiff seeks to prove an essential element of her case by circumstantial evidence, she cannot recover merely by showing that the inferences she draws from those circumstances are *consistent* with her theory. Instead, she must show that the inferences favorable to her are *more reasonable or probable* than those against her. (See *San Joaquin Grocery Co.* v. *Trewhitt* (1926) 80 Cal.App. 371, 375-376 [252 P. 332] [if it appears that the facts from which an inference is drawn, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for]; *Estate of Moore* (1923) 65 Cal.App. 29, 33 [223 P. 73] [where the only evidence gives rise to conflicting evidence, there is no proof, only guesses and conjecture].) ▆▆▆ Since there is no direct evidence that the rapist entered or departed through the broken gate (or even that the broken gate was the only way he could have entered or departed), Leslie cannot survive summary judgment simply because it is *possible* that he *might* have entered through the broken gate. (*Brautigam* v. *Brooks* (1964) 227 Cal.App.2d 547, 556 [38 Cal.Rptr. 784] [an inference cannot be based upon mere possibility]; *Estate of Gutierrez* (1961) 189 Cal.App.2d 165, 173 [11 Cal.Rptr. 51] [it is axiomatic that an inference may not be based on suspicion alone, or on imagination, speculation, surmise, conjecture or guesswork]; *Reese* v. *Smith* (1937) 9 Cal.2d 324, 328 [70 P.2d 933] [a judgment cannot be based on guesses or conjecture]; *Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 418 [9 Cal.Rptr. 10] [inferences must be drawn from evidence and not based on mere speculation as to probabilities without evidence].)

3.

In this case, no one (other than the rapist, who has never been caught) knows how the rapist got into or out of the garage. Although the three access doors to the garage were found closed on the day after Leslie's rape, no one

knows whether they were closed or propped open on the night of the rape.[4] No one knows whether the rapist followed another tenant in through the front door and then found his own way down to the garage. No one knows whether the rapist somehow obtained a key to the premises (he could have found a lost key or stolen one from another tenant). These unknowns are significant because, had the gate been operating properly, the rapist still could have entered the garage. Moreover, even if it had been working, he could have entered through the security gate itself by waiting outside for a car to enter, ducking beneath the closing gate, and hiding in the garage as he apparently did on the night of Leslie's rape. (*Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657] [where the evidence is such that it is a matter of conjecture whether a particular deduction is warranted from the facts which are known, there is no basis for a legally sufficient inference]; *Savarese* v. *State Farm etc. Ins. Co.* (1957) 150 Cal.App.2d 518, 520 [310 P.2d 142] [an inference may be based on another inference only when the first inference is a reasonably probable one and, even where it is, when the building of inference upon inference results in a progressive weakening of logical sequence and leads to an ultimate conclusion which is untenable on the basis of the facts proven, the ultimate inference is legally too remote and must be rejected].)

In short, there simply is no evidence from which to infer causation. ■ Although proof of causation may be by direct or circumstantial evidence, it must be by "substantial" evidence, and evidence "which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient." (*Showalter* v. *Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 471 [106 P.2d 895]; see also Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269 [a mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law].)

■ In California, very little has been written about the specific sort of proof it takes to establish causation in a negligence action against a landowner arising out of a third party's criminal or negligent conduct. (See *Nola*

---

[4]The police report does not state one way or the other whether the doors were open. Leslie contends that, had a door been open, it would have been noted in the report and that, since the report is silent, the logical inference is that all three doors were closed and locked. There are, however, several other equally logical inferences—that the officers did not even check the doors (at least one officer testified that he had no recollection of checking the doors), that an unlocked door through which the rapist entered was locked by another tenant during the period of time between the rape and the time the police arrived, that a door was unlocked or propped open when the rapist entered but closed by another tenant while the rapist waited in the garage for a likely victim, that a door was propped open when the rapist entered but closed by him when he left (the doors were automatically self-closing). The problem with all of these inferences is that they are pure speculation.

*M.* v. *University of Southern California, supra,* 16 Cal.App.4th at pp. 428-435, including fn. 6 and cases there cited.)[5] However, there is relevant authority from other jurisdictions, and it is consistent with general principles of California law and with the conclusion we reach in this case. For example, in *Dawson* v. *New York City Housing Auth.* (1994) 203 A.D.2d 55 [610 N.Y.S.2d 28], the plaintiff was shot in the eye while looking through the peephole in his apartment door. He sued his landlord, claiming there was inadequate police security in the building and that the locks on the outer doors of the building were inadequate. On the landlord's appeal, the court held the landlord's motion for summary judgment should have been granted because the plaintiff "presented no evidence that his assailant took advantage of an unlocked outer door to gain entry to the building, and therefore he has not raised a factual issue as to whether the [owner's] alleged negligence was the proximate cause of his injury [citations]. A jury finding for plaintiff

---

[5]Leslie disagrees with this statement. Pointing to our decision in *Nola M.,* she claims we resolved the problem by the following statement: "We think it comes down to this: When an injury can be *prevented* by a lock or a fence or a chain across a driveway or some other physical device, a landowner's failure to erect an appropriate barrier can be the legal cause of an injury inflicted by the negligent or criminal act of a third person." (*Nola M.* v. *University of Southern California, supra,* 16 Cal.App.4th at p. 436, italics added.) First, Leslie ignores the fact that, if she could *prove* her rape could have been *prevented* by a working security gate, we wouldn't be having this discussion. Second, Leslie's quotation stops too soon and ignores the facts before us in *Nola M.* The plaintiff in *Nola M.* was raped on the campus of the University of Southern California. She sued USC and won on a theory that the university was negligent in failing to deter the attack. At trial, her expert criticized USC's security measures and found them wanting but he did not, and on the facts of that case could not, say that 2 or 10 or 20 more guards or other security measures could have prevented the plaintiff's injuries. Although she won at trial, we reversed on the ground that abstract negligence, unconnected to an injury, will not support liability. (*Id.* at p. 424.) After a lengthy discussion of many cases, we made the statement upon which Leslie now relies—followed by citations to *Harper* v. *Vallejo Housing Authority* (1951) 104 Cal.App.2d 621 [232 P.2d 262] (where a child hit by a negligently driven car while playing in a recreational area provided by a public housing authority sued the housing authority) and *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 917-918 [214 Cal.Rptr. 395] because it quoted from *Goldberg* v. *Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291, 297, 10 A.L.R. 595] as follows: "It is an easy matter to know whether a stairway is defective and what repairs will put it in order . . . but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?" We then concluded: "But where, as here, we are presented with an open area which could be fully protected, if at all, only by a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented." (*Nola M.* v. *University of Southern California, supra,* 16 Cal.App.4th at pp. 436-437.) What we meant (and what we think is clear when Leslie's selective quotation is read in context) is that when an injury can be prevented by a simple physical device, then it is technically *possible* for the landowner's failure to install such a device to be a legal cause of a plaintiff's injuries. By no stretch of the imagination, however, did we say or intend to say that the failure to install such a device, without more, was sufficient to *prove* causation.

under these circumstances would have to be based on speculation, and thus set aside as a nullity." (*Id.* at pp. 55-56 [610 N.Y.S.2d at p. 30].)[6]

On facts strikingly similar to our case, an Illinois court has reached the same result. In *N.W.* v. *Amalgamated Trust & Sav. Bank* (1990) 196 Ill.App.3d 1066 [143 Ill.Dec. 694, 554 N.E.2d 629], a woman was raped by an unknown intruder who entered her apartment. The tenant sued her landlord, claiming the rape was made possible by a broken lock on the rear entrance to the building, a condition the tenant had complained about on numerous occasions. The Illinois Court of Appeal affirmed summary judgment in favor of the landlord, finding that (assuming duty and breach) proximate cause was not established because the tenant's kitchen door was accessible to other tenants and to their guests: "A mere possibility of a causal connection is insufficient to raise the requisite inference of fact." (*Id.* at p. 1077 [554 N.E.2d at p. 637]; see also *Blumenthal* v. *Cairo Hotel Corporation* (D.C.App. 1969) 256 A.2d 400, 402 [negligence action against landlord fails where there is no proof an intruder gained access to a tenant's apartment by climbing up bars covering first floor windows which, according to the tenant, were negligently placed].) These cases are entirely consistent with California law. (*Brautigam* v. *Brooks*, *supra*, 227 Cal.App.2d at p. 556 [if the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not her adversary]; *Krause* v. *Apodaca*, *supra*, 186 Cal.App.2d at p. 418 [a majority of chances never can suffice alone to establish a proposition of fact].)

---

[6]See also *Mkrtchyan* v. *61st Woodside Associates* (1994) 209 A.D.2d 490, 490 [618 N.Y.S.2d 825, 826] ("Other than mere speculation [by] the plaintiffs' 'security expert,' there is no indication in the record that the absence of a functioning intercom . . . led to the assailant's presence in the lobby of the building . . . ."); *Kistoo* v. *City of New York* (1993) 195 A.D.2d 403, 404 [600 N.Y.S.2d 693, 694] ("Without any proof whatsoever as to the manner in which her assailant gained access to the building, plaintiff cannot prove that defendant's negligence, if any, was the proximate cause of her injuries . . . ."); *Pagan* v. *Hampton Houses, Inc.* (1992) 187 A.D.2d 325, 325-326 [589 N.Y.S.2d 471, 472] (where plaintiff is unable to prove how assailant entered the building, there is no causation because it is as likely as not that murder was committed by someone whose presence in the building was not due to any negligence by the landlord); *Hendricks* v. *Kempler* (1989) 156 A.D.2d 425, 425-426 [548 N.Y.S.2d 544, 545] (where plaintiff is unable to prove how assailant entered the building, it is just as likely as not that he entered through persons he knew in the building and there is no causation); *Clarke* v. *J.R.D. Management Corp.* (1983) 118 Misc.2d 547, 549 [461 N.Y.S.2d 168, 170-171] (plaintiffs in negligent security actions against landlords must be held "stringently to their proof" and, where there is no evidence about how criminals entered a garage, the plaintiff has failed to prove causation); *Hall* v. *Fraknoi* (1972) 69 Misc.2d 470, 474 [330 N.Y.S.2d 637, 641] (the fact that there was no front door lock or bell or buzzer system was not a cause-in-fact of a tenant's mugging).

4.

Leaving to one side the conflicting circumstantial evidence about the rapist's means of entry into the garage, Leslie contends the opinion testimony of her expert was sufficient to create a triable issue of material fact about causation and thus defeat Bowers' summary judgment. We disagree.

■ Although it is true that the testimony of a single witness may be sufficient to constitute substantial evidence (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831]), "[w]here an expert bases his conclusion upon . . . factors which are speculative, remote or conjectural, . . . the expert's opinion cannot rise to the dignity of substantial evidence." (*Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630].) As Division Two of our court explained in *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396 [209 Cal.Rptr. 456] (an action against the manufacturer of a contraceptive drug where the plaintiff claimed she developed cancer after taking the pills), "[t]here can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury . . . . A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. *This is the outer limit of inference upon which an issue may be submitted to the jury.* . . . [¶] The fact that a determination of causation is difficult to establish cannot . . . provide a plaintiff with an excuse to dispense with the introduction of some reasonably reliable evidence proving this essential element of his case. [*Expert testimony*] *can enable a plaintiff's action to go to the jury only if it establishes a reasonably probable causal connection between an act and a present injury*." (*Id.* at p. 403, italics added.)[7]

■ In *Wright* v. *New York City Housing Authority* (1995) 208 A.D.2d 327 [624 N.Y.S.2d 144], a mother sued her landlord, alleging her daughter was raped and murdered in their housing project apartment building because broken door locks and defective elevators required the tenants to use dangerous and dark stairwells. The Appellate Division of New York's Supreme Court held that the mother's security expert's testimony was insufficient to defeat the landlord's motion for summary judgment: "While an expert may, in his area of expertise, reach conclusions beyond the ken of the ordinary layman, he may only do so on the basis of the established facts. *He may not himself create the facts upon which the conclusion is based.* Here, there is no

---

[7]In *Jones*, one of the plaintiff's experts said the drug was a " 'contributing factor' " in causing her cancer. Her other expert said there was a "reasonable medical possibility" it was the cause. (*Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d at p. 401.)

evidence from which to conclude that the deceased . . . did, in fact, take the elevator to the 17th or 20th floor . . . and use the stairway to get to her 11th floor apartment or that any defective lighting in the stairway in any way contributed to her death. For all that appears, the deceased may have met her death at the hands of someone known to her or someone who confronted her outside her own apartment or in any of the public hallways and then dragged her into the stairway." (*Id.* at pp. 330-331 [624 N.Y.S.2d at pp. 145-146], italics added.)

For these reasons, McGoey's opinion testimony does not constitute substantial evidence of causation and it is insufficient, viewed by itself or with the circumstantial evidence, to create a triable issue of material fact.

### 5.

For the foregoing reasons, we hold that a tenant's negligence action against her landlord for injuries resulting from the criminal assault of a third person must be supported by evidence establishing that it was more probable than not that, but for the landlord's negligence, the assault would not have occurred. Where, as here, there is evidence that the assault could have occurred even in the absence of the landlord's negligence, proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture.

In this case, where there is no factual basis for the expert's opinion or for Leslie's general assertion of causation, the conclusion is unavoidable that summary judgment was properly granted.[8]

### III.

These cases raise problems far beyond the legal issues resolved by traditional rules of negligence. While Bowers may owe some sort of contractual duty to Leslie to provide her with a secure apartment building if that was a term of their agreement, we find it difficult to say that Bowers owed her a duty to protect her from criminal acts that not even the entire Los Angeles Police Department can prevent. And while the broken gate may or may not have been the means through which the rapist gained entry to

---

[8]At oral argument, it was suggested that, aside from the unlikely existence of a confession from the rapist or the existence of an eyewitness who happened to see the rapist enter through the gate, the required causal connection could be made if the rapist's fingerprints were found on or near the plaintiff and at or near the broken gate. Creative minds will certainly conjure up additional possibilities, all of which may at some point be considered in some other case, but none of which will be decided here.

Leslie's garage, we find it impossible to say that Bowers' failure to fix the gate actually "caused" Leslie's injuries. The cause was what the rapist did to her when he attacked and raped her. (See Prosser & Keeton, *supra*, § 41, p. 264 ["the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation' "]; Sharp, *Paying for the Crimes of Others? Landowner Liability For Crimes On The Premises* (1987) 29 S.Tex. L.Rev. 11, 17-18, fn. 16 ["Why not single out the criminal's parents for not teaching him to obey the law; the schools for not teaching him a trade; the city for permitting degrading slum areas that breed crime; the police for not preventing crime; the courts for not locking him up and keeping him from hurting others, or the prisons for not rehabilitating him?"].)

▮ As we said in *Nola M. v. University of Southern California, supra*, 16 Cal.App.4th at page 437, "[t]o characterize a landowner's failure to deter the wanton, mindless acts of violence of a third person as the 'cause' of the victim's injuries is . . . to make the landowner the insurer of the absolute safety of everyone who enters the premises." As Leslie's case demonstrates, the problem is not limited to a demand for security guards where none were provided (*Ann M. v. Pacific Plaza Shopping Center, supra*, 6 Cal.4th 666), or more guards where some were not enough (*Nola M. v. University of Southern California, supra*, 16 Cal.App.4th 421), or for the installation of bars on windows sufficient to make an apartment entry-proof (*Pamela W. v. Millsom, supra*, 25 Cal.App.4th 950), but also arises where the only demand was for the landlord to fix an existing security gate. With the steady and unrelenting increase in violent crime, we are seeing (and no doubt will continue to see) more and more variations on this theme.

▮ Perhaps it is time for the Legislature to address this issue. Until it does, there will be no consistency in these cases and that, in our view, simply isn't fair. Some victims may recover substantial verdicts, others may recover nothing. The opposite necessarily follows—some negligent land-lords may pay substantial verdicts while others pay nothing at all. Although this can be said about almost every aspect of our tort law, we find it particularly disquieting in this context—where the plaintiff's ability to re-cover from her landlord (and the landlord's obligation to pay) seem to turn on such quixotic considerations.

If as a matter of public policy our Legislature concludes it is proper to impose on landowners and others who possess or manage real property an obligation to insure the absolute safety of all persons who enter upon their

property against the ravages of today's violent society, then it is appropriate for the legislative branch of government to make that decision and adopt a rule of strict liability. If not, it is time to look for another approach. Slumlords can be and are punished for their actions. Remedies such as jail and withholding rent are already available to tenants and to the authorities, and other remedies can certainly be devised. But this case and others like it expose a victim's damage suit against her landlord for what it is—an artificial scheme designed not to fairly assess culpability but to reach into the deepest pocket. To paraphrase an apt comment in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814], "[t]he merely negligent actor [ought not to be required] to make monetary amends to all persons who may have suffered [at the hands of a violent criminal who perchance committed his crime on the defendant's property]. . . . Experience has shown that . . . there are clear judicial days on which [courts and juries] can foresee forever and thus determine [causation,] but none on which the foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury."

## DISPOSITION

The judgment is affirmed.

Ortega, Acting P. J., and Masterson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 12, 1996. Kennard, J., was of the opinion that the petition should be granted.