■ MIRIAM LEVY OATES, as Administratrix of the Estate of RACHEL LEVY, Deceased, et al., Respondents, v NEW YORK CITY TRANSIT AUTHORITY, Appellant, et al., Defendants. [30 NYS3d 606]—

Judgment, Supreme Court, Bronx County (Norma Ruiz, J.), entered September 9, 2013, upon a jury verdict, awarding plaintiffs $300,000 for decedent Rachel Levy's conscious pain and suffering; $150,000 for plaintiff Hadassah Levy's past loss of custodial services, and $400,000 for her future loss of custodial services (over a 10-year period); and $100,000 for plaintiff Miriam Levy Oates's future loss of nurture, care and guidance (over a five-year period), affirmed, without costs.

Decedent, mother of Miriam and daughter of Hadassah, was found dead under one of defendant Transit Authority's buses. While the bus driver had no explanation for how her body came to be there, plaintiffs' evidence, including DNA evidence matching samples recovered from the bus, was sufficient to support the jury's finding that the bus driver was negligent in operating the bus. The evidence showed facts and conditions from which negligence and causation could "be reasonably inferred" (*Wragge v Lizza Asphalt Constr. Co.*, 17 NY2d 313, 320 [1966]). In particular, plaintiffs showed that decedent's body had been crushed by the bus at such an angle that the bus driver, pulling out of the bus stop, should have, with the proper use of his senses, seen decedent (*see Klein v Long Is. R.R. Co.*, 199 Misc 532, 535 [Sup Ct, Kings County 1950], *affd* 278 App Div 980 [2d Dept 1951], *affd* 303 NY 807 [1952]).

Plaintiffs' uncontroverted expert testimony that decedent was conscious and in pain for two to five seconds after being hit by the bus supports the jury's finding that decedent sustained conscious pain and suffering prior to her death (*see Triana v Smith's Transfer Corp.*, 198 AD2d 476, 477 [2d Dept 1993]; *see also Stein v Lebowitz-Pine View Hotel*, 111 AD2d 572, 573 [3d Dept 1985], *lv denied* 65 NY2d 611 [1985]).

There was sufficient evidence of decedent's nuture, care and guidance to her daughter to justify the award to the latter (*see McHugh v New York City Tr. Auth.*, 95 AD3d 686 [1st Dept

2012]). Further, the Transit Authority waived its argument that decedent's mother could not recover damages for decedent's wrongful death, since it failed to raise the argument at any time before this appeal (*see* CPLR 3211 [a] [3]; [e]; *see also San Filippo v New York City Tr. Auth.*, 105 AD3d 665, 667 [1st Dept 2013]).

The amounts awarded are not excessive (*see* CPLR 5501 [c]; *Santana v De Jesus*, 110 AD3d 561, 562 [1st Dept 2013], *lv denied* 22 NY3d 864 [2014]; *Filipinas v Action Auto Leasing*, 48 AD3d 333 [1st Dept 2008]; *McHugh*, 95 AD3d at 686; *Van Norden v Kliternick*, 178 AD2d 167 [1st Dept 1991]).

Plaintiffs' counsel's remarks during trial did not deprive the Transit Authority of a fair trial, especially since the court gave curative instructions after many of the challenged comments (*see Boyd v Manhattan & Bronx Surface Tr. Operating Auth.*, 79 AD3d 412, 413-414 [1st Dept 2010]). Concur—Sweeny, Moskowitz and Gische, JJ.

Tom, J.P., and Andrias, J., dissent in a memorandum by Tom, J.P., as follows:

Plaintiffs' decedent's body was found lying face down on the southbound service road of the Henry Hudson Parkway in the Bronx, approximately five feet from the curb near the front of a bus stop. After an investigation, it was established, by DNA evidence, that the decedent was run over by bus 8865 operated by defendant New York City Transit Authority. The bus driver, Vincent Brady, and the passengers in the bus at the time of the occurrence did not see, feel or hear the bus come into contact with decedent. How decedent came to be run over is established by neither testimony nor physical evidence, and the conclusions advanced by plaintiffs' expert witness attributing negligence to defendant's driver have no foundation in the facts adduced at trial. The ensuing verdict awarding plaintiffs damages for wrongful death is thus predicated on no more than speculation, and cannot stand.

A call log from the New York City Fire Department shows that a report of "pedestrian struck" was received at 2:39 p.m. and that emergency medical technicians had arrived at the scene by 2:43 p.m. Police Officer Spiros Komis, an on-scene technician with the Highway Patrol Unit, testified that there was a fresh tire mark on the road surface leading directly to decedent's body, which was consistent with a tire mark on her back. His accident report indicates that the victim was pronounced dead at 2:42 p.m., and lists the weather conditions as clear and dry. Measurements he made indicate that decedent's feet were positioned on the service road ap-

proximately 125 feet south of the intersection with 236th Street and that the bus stop was located 134 feet, 6 inches south of the intersection. Komis testified that all of the photographs of decedent showed her feet and head pointing at a southeast angle on the roadway. A police sketch shows her head positioned five feet from the curb and her right foot about half that distance into the roadway, which is approximately 20 feet in width. An investigator's scene report states that decedent was found "lying approx. 4 feet from sidewalk curb clutching tote bag and a bag full of groceries." The death certificate lists the immediate cause as "Blunt Impact Injuries of Head and Torso."

Police Officer Michael O'Connor of the Highway Patrol Collision Investigation Squad testified that he and a Detective Ryan, now retired, went to the Kingsbridge Bus Depot to look for evidence that a bus had struck a pedestrian. Upon inspecting the undercarriage of bus 8865, he found what appeared to be "blood and body tissue just behind the right rear wheel of the bus." Swabs were taken from various locations. However, a forensic anthropologist with the Office of the Chief Medical Examiner testified that DNA analysis confirmed the presence of decedent's blood only on a swab taken from the right front tire of the vehicle. A "supplemental case information" report filed by Robert Yee, whose position is given as "medicolegal investigator II," states that the tire marks observed on the roadway measuring 11 inches in width correspond to the tire mark on the back of decedent's jacket. The report also notes the presence of "leaves against the sidewalk curb," and states that a sergeant from the 50th Precinct "at the scene offers that the decedent was a home health aide and had just finished her shift with a client that resided nearby the bus stop." Neither the sergeant nor the source of his information is identified.

Decedent's daughter, plaintiff Miriam Levy Oates, testified that her mother, who was 51 years old at the time of her death, worked every Sunday as a home attendant for an elderly woman who lived at the Briarcliff apartment building located behind, that is, to the west, of the bus stop. However, decedent had recently found a new job, and the date of the accident, October 29, 2006, was her last day of work at that residence.

Decedent's mother, plaintiff Hadassah Levy, testified that decedent had lived in her home virtually her entire life and was in very good health. Decedent always took the BX10 bus after finishing her work at the Briarcliff, where she customarily arrived at 9:00 a.m. and left sometime around 2:00 p.m.

The bus driver, Vincent Brady, had been driving the BX10 route for about four years before the accident. He recalled pick-

ing up only one person at the 236th Street and Henry Hudson Parkway bus stop but admitted it may have been as many as three passengers. He did not see anyone in the vicinity of the bus when he pulled away from the curb. He heard nothing and did not feel any impact. He stated that there were two blind spots: one on the right side of the bus extending 10 feet back from the front passenger door that was not visible in the passenger-side mirror, and another extending toward the front where a passenger-side route sign blocked forward vision. None of his passengers mentioned seeing, hearing or feeling anything as he drove away from the bus stop.

Dr. Monica Smiddy, a forensic pathologist with the Office of the Chief Medical Examiner, testified regarding the results of an external examination of decedent's body. The accident victim was well nourished, approximately 62 inches in height, and 124 pounds. There were very severe injuries to the pelvic region, chest and head, including pelvic fractures, multiple rib fractures, multiple fractures of the skull and facial bones, and multiple lacerations of the scalp. There were no leg fractures or fractures of the feet. Finally, there was "a small abrasion. of the skin surface overlying the left knee." Because the family objected on religious grounds, neither a toxicology study nor an autopsy was performed. Accordingly, the heart was not examined and "the brain was not examined for stroke or hemorrhage." However, blood and hair were submitted to the Medical Examiner's forensic biology laboratory for analysis.

Donald Phillips, an accident reconstructionist with a bachelor's degree in mechanical engineering, presented plaintiffs' theory of recovery to the jury. He noted the proximity of the bus stop to the Briarcliff apartment building, which was situated "directly behind it," and a light pole "where the accident took place." Decedent's body was found "just slightly north of that light pole," which held the bus stop signs at the time of the incident. From police photographs, he noted that the body was positioned face down with the feet oriented to the northwest and the head facing southeast.

Phillips, who did not visit the accident scene until more than six years after the occurrence, conceded that he did not know which direction decedent was coming from to the bus stop, where the bus stopped or started, the dimension of the bus or tires, or the path or rate of speed the bus was traveling. Yet, based primarily on photos of the position in which decedent's body was found and his observation of three buses, not even the same type of RTS bus that was involved in this accident, coming and going at the subject bus stop more than six years

after the accident, Phillips testified that he envisioned a "projection type impact," with the right front corner of the bus, as it was pulling away from the curb, pinning or "trapping" decedent to the light post and then propelling her five feet forward out into the roadway and the path of the right front wheel of the bus. From separate paths that he plotted for the front and rear tires as the bus pulled away from the curb, he posited that "the right outside rear tire could have been the one that went over her head." He offered no explanation for why decedent's blood was only found on the right front tire.

Phillips then, without any evidentiary basis, stated his opinion as to where decedent was positioned just before the accident, stating, "[B]ased on my review of the file materials and my understanding of the sequence of the accident, Ms. Levy would have been leaving her place of employment." To recite facts to fit his position on how the accident occurred, he concluded "she would have been generally moving north" as she approached the bus stop. And that "she actually got caught between the pole in [sic] the front of the bus and that's why she couldn't escape in front of the bus because she would have been backed up to the pole." He measured the distance from the base of the pole to the curb at 15 inches. He assigned no role to the blind spot in the vicinity of the front passenger door stating that for the right front tire to strike her, "she had to be in front of the bus," and there was no sign that she was dragged out into the roadway.

On cross-examination, Phillips conceded that the investigation had uncovered no evidence of any contact between decedent and the front or sides of the bus. He stated that he learned that decedent worked at the Briarcliff "from discussions with plaintiff's attorneys" and confirmed that if, under his hypothesis, decedent was approaching from the apartment building just before she was hit, she would have been facing the bus, because the bus stop was situated just north of a driveway leading to the entrance of the Briarcliff apartment building. He dismissed the possibility that decedent could have been running alongside the bus to try and catch it "because then she would be to the side of the bus not in front of it to get the two different tire paths."

Following his testimony, which concluded plaintiffs' case, defendant moved for dismissal on the ground that plaintiffs had failed to make out a prima facie case of negligence (CPLR 4401). Defendant contended that there was no testimony or other evidence showing that the bus was negligently operated or that the vehicle knocked down decedent, arguing that expert

testimony had to have a scientific or medical basis and could not be based on speculation. The court denied the motion.

Dr. Ali Sadegh, an accident reconstructionist for the defense, testified that the absence of any leg injury was inconsistent with being struck by the front bumper of a bus. In addition, there was no physical evidence on the front bumper or to the side of the bus to indicate that "there was any contact with anything." Finally, he opined that the abrasion on the left knee indicated that decedent "must have been falling down" before the contact with the bus.

It was error to deny defendant's dismissal motion. The jury's assessment of the facts surrounding an incident must be made upon competent proof, and the conclusions drawn by plaintiffs' expert witness lack any evidentiary foundation in the record. Rather, his theory of the accident is based on a series of unsubstantiated assumptions, the foremost of which is that decedent had just left her place of employment as a home care worker and was waiting for the bus (or possibly approaching the bus stop from the south) when she was struck. The only admissible evidence concerning when decedent's work day ended was given by her mother, Hadassah Levy, who put the time at "around twoish." When decedent actually left her workplace is simply unknown. Even accepting, for the sake of argument, that she left the Briarcliff at 2:00 p.m., there remains the question of what she was doing during the half hour before her death.

Under the scenario advanced by Phillips, decedent was waiting at the bus stop directly in front of the light pole to which the bus stop signs were affixed. The obvious problem with this supposition is that a person waiting for a bus gets on the bus when it arrives, and how decedent wound up under the bus rather than on it is unexplained. The majority points to no evidentiary proof to support the conclusion that defendant driver's negligence caused the bus to strike decedent and pin her to the light post and then propel her into the roadway. Clearly, there is not a scintilla of evidence to support Phillips's opinion as to the sequence of events of the incident; rather, the record is totally inconsistent with his theory of occurrence. It is suggested that decedent was somehow trapped by the light pole and could not escape being hit by the front corner of the bus as the bus pulled out. If this were the scenario, the front bumper of the bus would have come into contact with decedent first, trapping and propelling her. The evidence showed that there were no injuries to her lower extremities, and there was no evidence of physical contact on the front bumper or side of the bus.

Also, Phillips's theory does not explain why, when the passenger door opened to let on a passenger (or passengers), decedent did not simply get on board, or why, if decedent were somehow "trapped" between the bus and the lamp post, the other passenger (or passengers) who boarded did not see or hear the impact of the bus striking her and propelling her to the front of the bus and then rolling over her. Finally, the hypothesis that decedent was trapped and struck in front of the light pole and propelled onto the roadway is belied by the fact of where decedent's body was found. Under Phillips's theory, decedent would have been propelled south and east of the point of impact toward the direction the bus was traveling in, and, thus, her body should have been located *south*, not north, of the light pole. In other words, if the bus was traveling southbound and struck decedent in front of the bus stop and propelled her onto the roadway, decedent's body should have landed south of the bus stop. However, decedent's body was found face down situated north of the bus stop. The position and location of decedent's body completely repudiates Phillips's theory as to how this incident occurred.

The alternative possibility, that decedent was moving toward the bus from the south, is equally irreconcilable with the evidence. Apart from the failure to explain why neither the driver nor any of his passengers observed decedent's approach from the front of the bus, if decedent left the Briarcliff at 2:00 p.m., as plaintiffs' expert assumed, why was she not already waiting at the bus stop, as his primary theory maintains, instead of approaching the bus from the south, as he speculated?

The competent evidence is consistent with an alternative— and more probable—sequence of events. Decedent left her place of employment at about 2:00 p.m. She took the overpass to the other side of the Henry Hudson Parkway and bought a bag of groceries. She retraced her path back across the Parkway overpass, which left her at a crosswalk some 100 feet north of the BX10 bus stop. At some point while crossing the service road and walking south toward the bus stop, she saw the bus pull up and take on passengers, realized she might miss it, and began to run. Once alongside the bus, she would have been positioned on the right side of the vehicle, approaching the passenger door from the blind spot extending behind it. Burdened by a shopping bag in her left hand and a tote bag in her right, she was unable to wave or knock on the door to attract the driver's attention, so she made the unfortunate mistake of turning to her left to step in front of the bus where

the driver could see her standing in front of it. Tragically, she tripped over the defect in the curbing—or slipped on the leaves in the gutter or otherwise lost her footing—and fell or sprawled headlong with forward momentum into the roadway as the bus was pulling out. Unable to see her lying on the road surface because of the blind spot extending toward the right front of the vehicle due to the bus route signs, and with his attention directed to possible traffic to his left, the driver pulled out, running over her. The scrape abrasion mark on her left knee would indicate that she fell forward, scraping her knee on the roadway.

Had decedent been struck by the bus and her body propelled approximately five feet into the roadway, as urged by plaintiffs' expert, the contents of the grocery bag and her tote bag would have scattered onto the roadway. However, decedent was found face down with one hand clutching her tote bag and the other clutching a grocery bag, with the contents of the bags intact. Those facts support the inference that decedent suddenly tripped and fell while holding onto the two bags. That she was propelled approximately five feet into the roadway supports the conclusion that she fell while running, which explains how her body came to rest on the roadway at an angle facing southeast, five feet from the curb.

This sequence of events is more plausible than the one presented by plaintiffs' expert witness and has the distinct advantage of having a sound basis in the trial evidence. It explains what decedent was doing during the half hour immediately preceding her death. It also explains why no one saw her standing at the bus stop or approaching the bus as the driver prepared to depart. Most significantly, it conforms to the evidence—the bag full of groceries intact, the absence of any indication of contact between decedent and the front or side of the bus, the location of decedent's body north of the light pole, the angle of her body to the roadway, and the scrape found on her left knee. The position of decedent's arms as depicted in police photographs—elbows at her side, her hands positioned toward her head and still grasping her bags—is further suggestive of someone trying to break a fall. By contrast, the theory propounded by plaintiffs' expert does not correlate with any of the facts and is merely specious. It required the jurors to speculate about facts not in evidence in order to accept its conclusions, which renders it "worthless as evidence" (*Cassano v Hagstrom*, 5 NY2d 643, 646 [1959]).

To attribute negligence to Vincent Brady, plaintiffs postulate that decedent was present at the bus stop in a location where

she could be readily observed by the driver, in the exercise of due care, when he pulled away from the curb. Their hypothesis rests on the expert's assumption that decedent went directly to the bus stop after finishing work. No evidence supports this supposition. No one saw decedent at the bus stop, and the time of her departure from her job at the Briarcliff can only be approximated ("around twoish," according to her mother). The physical evidence—a bag full of groceries—suggests that, contrary to plaintiffs' theory, she may have gone shopping before attempting to catch the bus.

Plaintiffs' second major deviation from the record evidence concerns the mechanism of the accident. According to their expert witness, decedent was struck while standing in front of the light pole and projected forward and into the roadway by the front bumper of the bus. There is simply no evidence, either from the condition of the bus or the physical injuries sustained by decedent, that she came into contact with any other part of the bus other than the right front tire. Finally, her body was found north of the light pole, a location altogether incompatible with an impact between a bus traveling south and a person standing at that light pole.

It is settled that the driver of a vehicle is not chargeable with negligence for failure to see a pedestrian who suddenly darts into the street (*Rucker v Fifth Ave. Coach Lines*, 15 NY2d 516 [1964], *remittitur amended* 15 NY2d 852 [1965], *cert denied* 382 US 815 [1965]; *Williams v New York City Tr. Auth.*, 108 AD3d 403 [1st Dept 2013]). There is no evidence to controvert Vincent Brady's testimony that he never saw decedent and that neither he nor any of his passengers were even aware of any impact with the bus. Thus, there is no proof of negligence on the part of the bus operator.

Plaintiffs attempt to invoke the *Noseworthy* doctrine to subject this wrongful death action to a lower standard of proof (*Noseworthy v City of New York*, 298 NY 76 [1948]; *see Wragge v Lizza Asphalt Constr. Co.*, 17 NY2d 313 [1966]). However, *Noseworthy* does not relieve a plaintiff of the obligation to establish that the defendant's negligence substantially contributed to the injuries sustained (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980]). Moreover, under circumstances such as these, where there are no witnesses to an accident, the doctrine is inapposite, because the parties are equally situated, neither having knowledge of the surrounding events (*see Wright v New York City Hous. Auth.*, 208 AD2d 327, 332 [1st Dept 1995]). Even where applicable, at least an inference of negligence must be established before a plaintiff may

invoke the doctrine, and mere contact with a vehicle is insufficient for that purpose (*Wank v Ambrosino*, 307 NY 321 [1954]; *Trillo v Gerry*, 135 AD2d 625 [2d Dept 1987]).

Accordingly, it is my opinion that the judgment should be vacated and the complaint dismissed.