Filed 12/19/24 Certified for Publication 1/10/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BROOKE STOKES et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>FORTY NINERS STADIUM MANAGEMENT CO., LLC, et al.,<br><br>    Defendants and Respondents. | H050639<br>(Santa Clara County<br>Super. Ct. No. 19CV357748) |

Late in the afternoon on October 7, 2018, while leaving a San Francisco Forty Niners (49ers) football game, Mark Stokes was severely injured in the Santa Clara Levi's Stadium (Stadium) parking lot after being punched twice in the face by another fan, defendant David Gonzales (Gonzales). The incident ensued after Stokes kicked a glass bottle that struck Gonzales's car. Stokes was rendered unconscious, sustained a brain injury, and never worked again. He passed away in March 2021 after suffering a severe asthma attack which his family alleged would not have been fatal but for his prior head trauma. Gonzales was charged with a felony. He pleaded no contest to assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and he was sentenced to one year in county jail.

Stokes and his then-spouse, Jessica, filed a complaint in October 2019, alleging claims for negligence, premises liability, and loss of consortium against Forty Niners Stadium Management Co., LLC (Stadium Management) and Landmark Event Staffing

Services, Inc. (Landmark). (Hereafter, Stadium Management and Landmark are collectively referred to as defendants.) After Stokes's death, the operative second amended complaint (Complaint) was filed by Jessica, as guardian ad litem on behalf of Stokes's and her two minor children, Brooke and Cheyenne (hereafter, collectively, plaintiffs). It was alleged in the Complaint that defendants were negligent in failing to prevent the assault, and in failing to provide reasonably adequate security.

Stadium Management filed a motion for summary judgment challenging plaintiffs' claims founded in negligence, asserting that there were no triable issues of fact that Stadium Management breached a duty of care or that any alleged breach caused Stokes's injury. Landmark filed a separate motion for summary judgment, or, in the alternative, for summary adjudication, similarly contending that it did not breach a duty of care and that any alleged breach was not the cause of the injuries to Stokes. Landmark also argued that there was no triable issue of fact that it owed a duty of care to prevent the unforeseen harm caused by Gonzales's criminal actions, and that Landmark could not be found liable for premises liability because it did not own, operate, or control the parking lot outside the Stadium. The trial court granted both defendants' motions for summary judgment in September 2022, and separate judgments were thereafter entered in favor of Stadium Management and Landmark.

Plaintiffs argue on appeal that the trial court erred because, inter alia, there were triable issues of material fact that both defendants owed a duty to Stokes, breached that duty, and their negligent acts and omissions in providing security to fans in the Stadium parking lot were a substantial factor in causing the harm to Stokes from the assault by Gonzales. We conclude that the record from the summary judgment motions presents no substantial, nonspeculative evidence from which a trier of fact could conclude that the acts or omissions of defendants (or either of them) caused Stokes's injuries. Since plaintiffs could not establish causation—an essential element of their negligence and

2

premises liability claims—the trial court did not err in granting defendants' motions for summary judgment.  We will therefore affirm the judgments.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Pleadings

An initial complaint was filed on behalf of Stokes and his wife, Jessica, on October 30, 2019, alleging claims for general negligence, premises liability, and loss of consortium.[1]  Shortly thereafter, they filed a first amended complaint adding Gonzales as a defendant.

After Stokes passed away in 2021, Jessica Flores (formerly Jessica Stokes), as guardian ad litem for her two minor children, Brooke and Cheyenne, filed a Judicial Council form Complaint on February 22, 2022.  Plaintiffs alleged that on October 7, 2018, at the Stadium, Gonzales struck Stokes "twice in the head[,] causing serious brain damage and ultimately [his] death."  As against Stadium Management and Landmark, plaintiffs alleged causes of action for general negligence and premises liability.  Plaintiffs alleged that defendants negligently:  (1) "failed to take reasonable steps to prevent the violent attack on Mr. Stokes," despite their knowledge of prior violence in the stadium and parking lots; (2) "failed to provide reasonably adequate security"; (3) "permitted known criminals and/or gang members to be present"; (4) "failed to promote responsible consumption of alcohol"; (5) "promoted excessive consumption of alcohol before, during and after Stadium events"; and (6) "failed to eject from the Stadium and parking lots persons consuming alcohol after the game had ended and/or [persons] exhibiting drunk or disorderly conduct."

In their premises liability cause of action, plaintiffs alleged that defendants "negligently owned, maintained, managed and operated the described premises," and that they "negligently failed to provide reasonable security in the Stadium and parking lots,

---

[1] The initial complaint named as defendants both Stadium Management and Landmark, as well as additional parties who were not named in the operative Complaint.

allowed and encouraged excessive consumption of alcohol, and created a dangerous condition and situation to exist on their premises."[2]

## B. Summary Judgment

### 1. Defendants' Motions

#### a. Stadium Management's Motion

In May 2022, Stadium Management moved for summary judgment. Stadium Management argued that: (1) there was no triable issue of fact that it breached a duty of care; (2) there was no triable issue of fact that any alleged breach of duty caused Stokes's injuries; and (3) plaintiffs' discovery responses on breach of duty and causation were "factually devoid," thus demonstrating that plaintiffs could not present evidence regarding these negligence elements.

Stadium Management argued that there was no triable issue of fact showing any causal connection between its security measures and the injuries sustained by Stokes through the unforeseeable criminal assault by Gonzales. It asserted that the entire incident was "swift and sudden," occurring in seconds, and that any suggestion that the injury could have been prevented by increased security measures was "pure speculation." Stadium Management contended further that its security measures were adequate under the circumstances and were far more robust than the security employed at a Major League Baseball stadium that had been found to have been sufficient in *Noble v. Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912 (*Noble*).

#### b. Landmark's Motion

Also in May 2022, Landmark moved for summary judgment or, in the alternative, summary adjudication of issues. Landmark contended that: (1) it owed no duty to Stokes "to ensure his safety by preventing ***unforeseeable spontaneous*** attacks"; (2) "although it owed a duty to prevent Stokes from ***reasonably foreseeable*** harm, it did not breach this

---

[2] Plaintiffs also alleged claims for negligence and intentional tort against Gonzales.

duty because Gonzales's split-second act of aggression was not reasonably foreseeable or reasonably preventable"; and (3) "any arguable breach of duty on [Landmark's] part[] was not the substantial cause of Plaintiffs' damages." (Original bold & italics.) Landmark argued further that plaintiffs' claim for premises liability was not maintainable because Landmark did not own, lease, occupy, or control the Stadium.

Landmark argued that testimonial and videotape evidence demonstrated that the incident was a "split-second attack" that it owed no duty to prevent. There was deposition testimony that the incident occurred very quickly, and that the time between when Stokes kicked the bottle and his being struck twice by Gonzales was too brief for anyone to have intervened. Further, the videotape footage of the area of the parking lot supported the conclusion that the incident was a split-second assault that was not foreseeable. And Landmark asserted that prior to the incident, there had been no interaction between Stokes and Gonzales that would have made the sudden attack by Gonzales foreseeable.

Landmark asserted further that there was no triable issue of fact that it breached its duty of ordinary care in providing for the safety of persons attending the October 7, 2018 game. It argued that it provided in excess of 500 security personnel, including 30 personnel regular staff security and off-duty peace officers in the specific parking lot where the incident occurred.

Additionally, Landmark contended that, even assuming duty and breach, there was no act or omission by Landmark that was a substantial factor in causing Stokes's injuries, and thus plaintiffs could not satisfy this element of their negligence claim. Relying on *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 (*Saelzler*), Landmark argued that causation exists only if it is more probable than not that the defendants' breach of duty was a substantial factor resulting in the injury (*id.* at pp. 775-776), and because no such evidence of causation existed in this instance, plaintiffs could not establish their negligence claim.

5

### 2.      *Defendants' Evidence*

There was evidence common to both defendants (Stadium Management and Landmark) that was submitted in support of their respective motions. That evidence included the following:

### a.      **Stadium Security**[3]

Landmark is an entity that provides traffic and parking control, crowd management, guest services and 24-hour security services. It provides services at professional and college sporting events, concerts, and other special events.

Stadium Management contracted with Landmark in February 2017 for the latter to provide services to assist Stadium Management with security in safeguarding the Stadium, areas around the Stadium, and its patrons. Stadium Management agreed to direct the number and location of staff that Landmark would provide for events at the Stadium. Landmark typically provided at 49ers games—before, during, and after the events—event security staff and off-duty peace officers inside the Stadium and in Stadium parking lots. One of the rules that Landmark security enforced in the Stadium parking lots as of October 2018 was that all tailgating was to cease after kickoff.

There were 53,582 people in attendance at the game on October 7, 2018.[4] Parties responsible for Stadium security, including on-duty peace officers, had in place at least 923 persons who provided security for the Stadium and its parking lots. There was thus

---

[3] When they filed their opening brief, plaintiffs filed two versions of the 12-volume appellants' appendix, one that was unredacted and filed under seal and one that was redacted. Due to confidentiality concerns, defendants thereafter filed requests in this court permitting the filing of redacted respondent briefs along with the filing of unredacted respondent briefs under seal. The court granted these requests. Neither the court's tentative ruling nor the order granting the motions for summary judgment was filed under seal. The basic facts presented herein relative to Stadium security were recited in the trial court's tentative ruling and its order granting summary judgment; neither of these documents that are part of appellants' appendix contained redactions.

[4] Although it is not material to the resolution of the issues in this appeal, plaintiffs disputed this fact, asserting that the official attendance was 68,337.

a ratio of one security member per 58 fans.[5]  This security included:  (a) 397 uniformed Landmark security personnel and 38 off-duty police department officers employed by Landmark; (b) 123 uniformed on-duty Santa Clara Police Department (Police Department) officers, including multiple bike patrol officers; (c) 29 uniformed on-duty California Highway Patrol (CHP) officers and 33 CHP traffic control staff; (d) 27 uniformed on-duty deputies from the Santa Clara County Sheriff's Department; (e) 9 uniformed deputies from the San Francisco County Sheriff's Department; (f) 15 temporary holding facilities and command staff; and (g) 262 guest services representatives and 28 logistics staff members.

Stadium Management submitted evidence, including a copy of the Event Action Plan for the October 7, 2018 game.  That document indicated the assignment of stationary and roaming security personnel (not affiliated with Landmark) assigned to the parking lots adjacent to the Stadium; these assignments included security for Red Lot 1, where the incident occurred.

According to Landmark's moving papers, on the day of the incident, Landmark had a total of 528 security personnel (including 64 off-duty peace officers) working at the Stadium and its surroundings for the 49ers game.[6]  Of the 64 off-duty officers, 26 were posted on bikes throughout the Stadium parking lots.  More specifically, Landmark deployed 30 roaming personnel in the particular lot where the incident occurred, including 6 off-duty peace officers on bikes wearing gray polo shirts and blue high visibility vests, and 24 security personnel wearing yellow Landmark polo shirts and high

---

[5] Defendants presented slightly different figures representing the total security presence at the October 7, 2018 game.  Stadium Management indicated a figure of at least 961 persons, or one security person for every 55 fans, while Landmark stated that there were 923 security personnel deployed, for a ratio of one security person for 58 fans.

[6] As noted, Stadium Management identified in its motion that there were 397 Landmark uniformed security and 38 off-duty Police Department officers employed by Landmark for the October 7, 2018 game.

visibility vests.[7]  The Landmark security personnel deployed to the Stadium parking lot carried radios so that they could communicate with the Command Center inside the stadium.  The Command Center had video screens to monitor activities at Stadium seating, concourses, and parking lots that were captured on security cameras maintained by Stadium Management.  The Command Center was staffed by Police Department, fire department, and traffic control personnel with the ability to dispatch police, fire, or emergency medical services as required.

### b.      October 7, 2018 Incident

On the afternoon of October 7, 2018, Stokes attended the 49ers game at the Stadium with friends Jesse Martin, Chris Martinez, and Alexander Garcia.  (Hereafter, Stokes, Martin, Martinez, and Garcia are referred to collectively as the Stokes group.)  They arrived in Martin's truck at approximately 10:00 a.m., parked in the Stadium lot, and tailgated for about three hours before the game.  Stokes consumed several beers and some whiskey during that time, and several more beers during the game.

Gonzales attended the game on October 7, 2018 with his girlfriend, Alma Castro, and friends Erica Castro and Joel Rodriguez.  (Hereafter, Gonzales, Alma Castro, Erica Castro, and Rodriguez are collectively referred to at the Gonzales group.)  They arrived in Gonzalez's vehicle at approximately 12:15 p.m., parked in Stadium Red Lot 1, near pole 20, and tailgated for about one hour before the game.  Gonzales had several beers while tailgating, and several more during the game.  There was no evidence that there were any interactions between the Stokes group and the Gonzales group before the incident.

---

[7] In their opposition papers, plaintiffs included Landmark discovery responses that provided additional specifics concerning Landmark personnel (including names of employees) who were assigned to the parking lots, including Red Lot 1 where the incident occurred.  In Landmark's reply papers, it submitted further documents identifying its security personnel who were assigned to the parking lots.

The Gonzales group left the Stadium before the game ended.  The Gonzales group returned to Gonzales's car and began packing up to leave.  Gonzales opened a beer while the group waited for Erica Castro to return from the restroom; Gonzales had several ounces of beer before the incident occurred.

The Stokes group left the Stadium at about 4:35 p.m., and they walked back toward Martin's truck.  As Stokes neared the Gonzales group, he kicked an empty glass bottle, which struck the side of Gonzales's car.  Stokes approached the car and Gonzales rushed toward Stokes.  When they met, Gonzales immediately punched Stokes in the face; Stokes fell back to the pavement.  Immediately after Stokes got up, Gonzales punched him again in the face, and Stokes fell back, struck his head on the pavement, and then lay still.[8]  Before punching Stokes, Gonzales did not look around the area to see if police or security were in the vicinity.

The entire encounter, which took place at approximately 4:51 p.m., from Stokes kicking the empty bottle to Gonzales's second punch, occurred within seconds.  Based upon videotape evidence presented in defendants' motions, a period of nine seconds elapsed from the time Stokes appears (after kicking the bottle) to Gonzales's second punch that left Stokes unconscious.  The witnesses to the incident—Martin, Garcia, Rodriguez, Erica Castro, and Alma Castro—uniformly testified that the incident happened quickly and there was no chance for anyone to intervene.

Slightly more than three minutes later (at 4:55 p.m.), the Gonzales group drove away from the scene.

Emergency medical services (EMS) were dispatched to the scene at 4:59 p.m., as were roving bike Police Department officers.  EMS arrived at 5:00 p.m., provided on-

---

[8] Gonzales testified that after Stokes threw or kicked a bottle that struck Gonzales's car (Cadillac SUV), he continued to approach him.  Gonzales testified that he believed he was being attacked, and he punched Stokes twice in the head because he thought he and his family were in danger.

scene treatment, and then transported Stokes to Valley Medical Center for emergency medical treatment. Stokes allegedly sustained traumatic brain injuries as a result of the assault. He passed away in March 2021 after suffering a severe asthma attack.

Gonzales was arrested the day after the incident. He pleaded no contest to assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and he was sentenced to one year in county jail.

### 3.        *Opposition to Summary Judgment Motions*

Plaintiffs filed separate oppositions to the two motions.

In their opposition to Landmark's motion, plaintiffs argued that Landmark failed to demonstrate by competent evidence the *actual presence* of adequate security personnel in the Stadium parking lots at the time of the incident; accordingly, plaintiffs argued, Landmark did not make a prima facie showing defeating the claims, and the burden of producing evidence to oppose the motion never shifted to plaintiffs. Plaintiffs asserted that there were triable issues of fact as to whether Landmark breached its duty of care. Plaintiffs argued further that they presented triable issues as to whether Landmark had provided *any* security in the parking lot where the incident occurred, and whether it had performed its job of enforcing the Stadium's policies against loitering, tailgating, and drinking alcohol in the parking lots after kickoff. They contended that Landmark's actions and inactions "contributed substantially to causing [Stokes's] injury." Plaintiffs' core argument was: "[I]f defendant [Landmark] had exercised reasonable care in providing security in the parking lot, defendant Gonzales would more likely than not have left before [Stokes] came along, or at least would have been aware of security in the area [which would have] deterred [Gonzales] from committing the assault."

Plaintiffs presented similar arguments in their opposition to Stadium Management's motion. These arguments included that: (a) Stadium Management did not show by competent evidence that there was adequate security actually present in the parking lots after the game; (b) there was *no* security in Red Lot 1 at the time of the

10

incident; (c) Stadium Management did not enforce its own policies that prohibited tailgating in parking lots after kickoff; and (d) there were triable issues as to whether Stadium Management's negligent failure to provide adequate security was a substantial contributing cause to Stokes's injuries

### 4. Plaintiffs' Opposing Evidence

In opposing both motions, plaintiffs relied on deposition testimony from members of the Stokes group and the Gonzales group in support of their argument that there was *no* security in Red Lot 1 at the time of the incident. Specifically, Martin testified that after the assault, he ran toward the stadium looking for security or police for help, but he did not locate anyone. Garcia testified that 10 to 15 minutes elapsed from the time of the assault to the arrival of security. Rodriguez, Erica Castro, and Alma Castro testified that when they walked from the Stadium to Gonzales's car, they did not see police or security in the parking lot. Gonzales testified that there was no security nearby at the time of the incident, and that after the assault, they waited 10 to 15 minutes for security, but the police did not appear.[9] Similarly, Erica Castro testified that after the assault, they looked for security but were unable to find anyone.

In opposing Stadium Management's motion, plaintiffs noted that defendant's policies and rules prohibited tailgating, loitering, and drinking in the parking lots after kickoff, and that persons violating these policies and rule could be asked to leave. Stadium Management's Executive Vice President, James Mercurio, testified that fans were not allowed to drink alcohol in the parking lot after games. Plaintiffs argued that Stadium Management was aware that prior to October 7, 2018, there had been numerous instances of fan violence in the Stadium parking lots.

---

[9] Gonzales's testimony that he and his friends waited 10 to 15 minutes for security to arrive was refuted by parking lot video footage presented in the motions, which demonstrated that the Gonzales left less than four minutes after the incident.

Plaintiffs also relied on the declaration of their expert, Gil Fried, who described himself as "a public assembly risk management professional." Fried's opinions included that: (a) Landmark and Stadium Management did not satisfy their obligation "to take reasonable measures related to security and safety of Mark Stokes on October 7, 2018"; (b) defendants "did not perform their duties in compliance with applicable standards in the industry and standards of care on October 7, 2018"; (c) the injuries sustained by Stokes more likely than not "would have been prevented if defendants had complied with their own security and guest services policies, including reasonably appropriate and adequate deployment of crowd management personnel, and enforcement of Levi's Stadium rules governing the authorized use of the Red Lot 1 parking lot by fans"; and (d) Stokes more likely than not "would not have been injured if reasonably appropriate and adequate crowd management personnel had been present in Red Lot 1 to observe David Gonzales' unauthorized tailgating and alcohol consumption during the fourth quarter and after the October 7, 2018 football game and [had] intervened by enforcing venue policies and rules."

Additionally, plaintiffs submitted the declaration of a board-certified neurologist, Dr. Fernando Miranda. After reciting that Stokes had received prior diagnoses that he sustained severe traumatic brain injury as a result of the assault on October 7, 2018, Dr. Miranda opined that Stokes's traumatic brain injury "played a substantial role in and was a cause of his death" after hospitalization for a severe asthma attack in March 2021.

### 5. *Order*

After a hearing, the court issued an order granting both defendants' motions for summary judgment on September 1, 2022 (hereafter, the Order).

In its Order, the trial court held that Stadium Management had met its initial burden in the motion of showing an absence of causation, one of the elements plaintiffs were required to prove to establish negligence. After quoting at length from *Saelzler*, *supra*, 25 Cal.4th at pages 772 to 781, and discussing the evidence presented by Stadium

12

Management, the court concluded that plaintiffs had not raised in their opposition a triable issue of fact that any assumed negligence by Stadium Management was a substantial factor in causing Stokes's injuries. The court reasoned in part: "[T]here is evidence that the assault could and would have occurred even in the absence of any defendant's negligence: [Stokes] kicked the bottle, hitting Gonzales' car, moved towards Gonzales, and after being hit, continued to move towards Gonzales-all within as little as 5-7 seconds." Finding the opinions on causation of plaintiffs' expert Fried to be based upon "speculation and conjecture" and that there was no factual basis for the opinions, the court concluded that there was no triable issue on causation and granted Stadium Management's motion.

Addressing Landmark's motion, the trial court similarly held that Landmark had met its initial burden of showing an absence of causation. The court also found that "Landmark . . . [had] demonstrate[d] that it [did] not have the requisite control, ownership, leasing, or occupation of Levi's Stadium such that it could be held liable for premises liability." It concluded that plaintiffs did not present evidence in response to the motion to "suggest[] that it was more probable than not that, but for Landmark's negligence, the assault would not have occurred." The court again rejected Fried's opinions contained in his declaration. Because plaintiffs did not present evidence that "Landmark's conduct was a substantial factor in causing [Stokes's] injuries," the court granted Landmark's motion for summary judgment.

Judgment in favor of Landmark was entered on or about October 10, 2022. A separate judgment in favor of Stadium Management was entered on or about October 17, 2022. Plaintiffs filed a timely appeal.

## II.     DISCUSSION

### A.     Summary Judgment

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite

13

their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  As such, the summary judgment statute, Code of Civil Procedure section 437c,[10] "provides a particularly suitable means to test the sufficiency of the plaintiff's prima facie case and/or of the defendant's [defense]." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203, fn. omitted.)

As the moving parties, defendants here bore two burdens.  The first burden is that "from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted; see also § 437c, subd. (c) ["[t]he motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"].)  The second burden is that defendants bore "an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar*, *supra*, at p. 850.)  In meeting this burden, defendants were required to initially "show[] that the plaintiff cannot establish one or more elements of the action.  [Citation.]" (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*); see also § 437c, subd. (p)(2) [defendant meets initial burden of demonstrating that cause of action has no merit by "show[ing] that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action"].)  A defendant meets its burden by presenting affirmative evidence that negates an essential element of the plaintiff's claim.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  Alternatively, a defendant meets its burden by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential

---

[10] All unspecified statutory references are to the Code of Civil Procedure.

element of its claim. (*Aguilar*, *supra*, at p. 855.) "Once the defendant meets the foregoing burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action . . . [and plaintiff] set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citation.]" (*Saelzler*, *supra*, 25 Cal.4th at p. 780, quoting former § 437c, subd. (o)(2) [currently § 437c, subd. (p)(2)].)

"In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation]." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) In considering the parties' evidence in connection with a motion for summary judgment, the court "strictly scrutinize[s]" the declarations submitted by the moving party and "liberally constru[es]" those offered by the opposing party, and it "resolv[es]" any evidentiary doubts or ambiguities in [the opposing party's] favor." (*Saelzler*, *supra*, 25 Cal.4th at p. 768.) The opposing party may rely upon inferences, but "those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork. [Citation.]" (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161; see also *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 99 [" '[s]peculation . . . is not evidence' that can be utilized in opposing a motion for summary judgment".].) And inferences properly derived from the parties' evidence are viewed "in the light most favorable to the opposing party." (*Aguilar*, *supra*, at p. 843.)

### B. Standard of Review

An appellate court reviews a trial court's ruling on a summary judgment motion de novo. (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018; see also *Wiener*, *supra*, 32 Cal.4th at p. 1142 [appellate court independently reviews granting of summary judgment to ascertain whether there is a triable issue of material fact justifying the reinstatement of the action].) The court of appeal "[i]n practical effect . . . assume[s] the role of a trial court and appl[ies] the same rules and standards which

govern a trial court's determination of a motion for summary judgment. [Citation.]" (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

In conducting its de novo review, the appellate court "take[s] the facts from the record before the trial court when it ruled on [the summary judgment] motion. [Citation.] '. . . [The appellate court] consider[s] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' [Citation.]" (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034-1035.) Thus, in the instance of the granting of a defense motion for summary judgment, the reviewing court "determine[s] whether defendants . . . have shown, through the evidence adduced in this case . . . that plaintiff[s have] not established, and cannot reasonably expect to establish, a prima facie case . . . , a showing that would forecast the inevitability of a nonsuit in defendants' favor. If so, then under such circumstances the trial court was well justified in awarding summary judgment to avoid a useless trial. [Citation.]" (*Saelzler*, *supra*, 25 Cal.4th at p. 768.)

### C.    Negligence Claims

In this case, as in any negligence case, " '[t]o prevail on [an] action in negligence, plaintiff[s] must show that defendants owed [them] a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of [their] injuries.' [Citations.]" (*Wiener*, *supra*, 32 Cal.4th at p. 1142.) All negligence cases are "governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct. [Citation.]" (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46.) As our Supreme Court explained in *Saelzler*, *supra*, 25 Cal.4th at page 772, in the context of a claim against a landowner for damages resulting from a criminal assault by a third party on premises, a "plaintiff must show that

16

the defendant owed [him or] her a legal duty of care, the defendant breached that duty, *and the breach was a proximate or legal cause of* [his or] *her injury*." (Original italics.)

Generally, all persons are legally responsible "for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property." (Civ. Code, § 1714, subd. (a).) A premises liability claim is founded on a theory of negligence. (See *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205.) Although a premises "owner is not an insurer of the safety of its patrons, [he or she] does owe them a duty to exercise reasonable care in keeping the premises reasonably safe. [Citations.]" (*Ibid.*) Thus, a claim of premises liability shares all elements of a claim for ordinary negligence, namely, "duty, breach, causation, and damages. [Citations.]" (*Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998 (*Castellon*).)

**D.     Case Law Applicable to Both Summary Judgment Motions**

In support of their respective positions that there was no triable issue of fact concerning causation, defendants placed extensive reliance on *Saelzler*, *supra*, 25 Cal.4th 763, *Noble*, *supra*, 168 Cal.App.3d 912, and related authorities. Those cases inform and guide our conclusions in this appeal. and we discuss them below.

**1.     *Saelzler v. Advanced Group 400***

Similar to the case before us, *Saelzler*, *supra*, 25 Cal.4th 763, involved an appeal by the plaintiff, assaulted by third persons at an apartment complex, from the granting of summary judgment in favor of the defendants/property owners after the trial court concluded that any breach of duty concerning the adequacy of security measures for the premises did not proximately cause the plaintiff's injuries. (*Id.* at p. 771.) The plaintiff, a Federal Express employee, was seriously injured by three men who physically and sexually assaulted her after she attempted to deliver a package in the middle of the afternoon to a resident in an apartment complex consisting of 28 buildings and 300 units. (*Id.* at p. 769.) The assailants were never apprehended. (*Ibid.*) She alleged that the defendants, owners of the complex, were negligent in failing to provide adequate security

17

and in failing to warn others of known risks concerning the property, i.e., that dangerous people frequented the premises. (*Ibid.*) The plaintiff presented evidence "of frequent recurring criminal activity on the premises" known to the defendants. (*Id.* at p. 770.) The defendants took some measures to control the problem by hiring security personnel to patrol the complex at night and to regularly check access gates for damage and evidence of forced entry. (*Ibid.*) The trial court, notwithstanding having found the existence of " 'overwhelming evidence' "of prior criminal activity, trespass incidents, and gates that were broken or inoperative, granted summary judgment, concluding that "despite establishing the 'high foreseeability' that violent crime would occur on the premises, and [the] defendants' resultant duty to provide increased security, . . . [the] plaintiff failed to establish a 'reasonably probable causal connection' between [the] defendants' breach of duty and [the] plaintiff's injuries." (*Id.* at p. 771.) A majority of the Court of Appeal reversed, concluding that the plaintiff presented a triable issue of fact concerning causation. (*Id*. at p. 771.) The Supreme Court reversed, directing that the Court of Appeal affirm the trial court's judgment in the defendant's favor. (*Id.* at p. 781.)

Our high court emphasized that one element of a claim for negligence against a landowner for injuries sustained on premises due to a third-party assault is that "*the breach* [of the legal duty of care] *was a proximate or legal cause of her injury.* [Citations.]" (*Saelzler*, *supra*, 25 Cal.4th at p. 772, original italics.) As the court explained, since its sole inquiry there concerned causation—the defendants having not disputed the elements of duty and breach for purposes of the propriety of the trial court granting summary judgment—the sole question was whether "[the] defendants' possible breach of duty [was] a substantial factor in causing [the] plaintiff's injuries[.]" (*Ibid.*) The court observed that the rule in California was "that the plaintiff must establish, by nonspeculative evidence, some actual causal link between the plaintiff's injury and the defendant's failure to provide adequate security measures. [Citations.]" (*Id.* at p. 774.) In addressing causation, the Supreme Court rejected the plaintiff's contentions as

18

"speculative." (*Id.* at pp. 776, 777, 781.)  It concluded that the defendants' assumed breach of duty of failing to adequately secure gates and failing to hire daytime security was not a substantial factor in causing the plaintiff's injuries.  (*Id.* at p. 775; see also *id.* at pp. 776, 781.)  In doing so, the high court quoted the authors of a leading treatise on torts: " 'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant.*'  (Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269, fns. omitted, italics added.)" (*Id.* at pp. 775-776.)

The court in *Saelzler* reviewed five appellate decisions that similarly dealt with third-party assault victims who claimed that their injuries were proximately caused by landowners' acts and omissions in failing to provide adequate security for the premises where the incident occurred.  (See *Saelzler*, *supra*, 25 Cal.4th at pp. 772-775.)  As they provide guidance for our resolution of this appeal, we discuss these cases below.

### 2.     *Leslie G. v. Perry & Associates*

*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472 (*Leslie G.*) was a case that the Supreme Court found to be "perhaps closest on point." (*Saelzler*, *supra*, 25 Cal.4th at p. 774.)  The plaintiff in that case was raped by an unknown assailant at approximately 2:00 a.m. after she entered the underground garage of her apartment building by using her security access card.  (*Leslie G.*, *supra*, at pp. 476-477.)[11]  The trial court granted the defendants' motion for summary judgment, concluding that the subject

---

[11] Although the building had underground parking with a security gate accessible only by a security card, there was evidence that, for months prior to the incident, the gate was intermittently not functional and, according to the plaintiff, it did not close completely on the night of the incident. (*Leslie G.*, *supra*, 43 Cal.App.4th at pp. 477-478.)  There was no evidence, however, as to whether the assailant did or did not gain access to the parking area through the security gate entrance or through other points of access to the garage. (*Id.* at p. 479 & fn. 3.)

incident was not foreseeable because there had been no similar incidents in the apartment complex in the previous two years. (*Id.* at pp. 479-480.)

The appellate court did not address the elements of duty and breach of duty; it assumed their existence and focused upon the issue of causation. (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 481.) The court explained: "In California, the causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty (his negligent act or omission) was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability. [Citations.] In the context of this case, the causation analysis is unaffected by the fact that the assailant's conduct was criminal and not merely negligent. Stated in traditional terms, the assailant's attack is not a superseding cause and it does not, in itself, relieve the defendant of liability. As our Supreme Court has explained, if the likelihood that a third person may act in a particular manner is ' "one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." ' [Citations.]" (*Ibid*.)

After noting that the plaintiff bore the burden of showing causation, the appellate court in *Leslie G.* concluded that the record indicated that this element was not and could not be proven. (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 482.) The court observed that while causation could be shown by direct or circumstantial evidence, such evidence of causation must be substantial, and could not be based upon "a mere possibility" or one resulting from "pure speculation or conjecture." (*Id.* at p. 484.) It concluded that there were many unknown variables, including the circumstances that permitted the assailant to enter the secured garage, that precluded an inference of causation based upon the defendants' negligent acts or omissions. (*Id.*, at pp. 483-484.) The appellate court held that "[s]ince there is no direct evidence that the rapist entered or departed through the broken gate (or even that the broken gate was the only way he could have entered or departed), Leslie cannot survive summary judgment simply because it is *possible* that he

*might* have entered through the broken gate. [Citations.]" (*Id.* at p. 483, original italics.) In conclusion, the *Leslie G.* court held that "a tenant's negligence action against her landlord for injuries resulting from the criminal assault of a third person must be supported by evidence establishing that it was *more probable than not* that, but for the landlord's negligence, the assault would not have occurred. Where, as here, there is evidence that the assault could have occurred even in the absence of the landlord's negligence, proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture." (*Id.* at p. 488, italics added.)

### 3.   *Nola M. v. University of Southern California*

In *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 424 (*Nola M.*), the plaintiff sued a university for negligence in connection with injuries sustained during an on-campus assault and rape by an unknown assailant. She based her claim that the defendant's inadequate security was a substantial factor in causing her injuries, in part, upon testimony from her expert witness, who was highly critical of the defendant's deployment and patrolling measures of on-campus security personnel. (*Id.* at p. 425.) The plaintiff obtained a judgment following a jury trial which, after she accepted a remittitur in lieu of the granting of a new trial motion, was in excess of $1.2 million. (*Id.* at pp. 425-426.) Concluding that the university's failure to deter the assault was not the cause of the plaintiff's injuries, the appellate court reversed with directions to enter judgment in favor of the defendant. (*Id.* at p. 439.)

The court noted that to establish causation, the defendant's conduct would need to have been a substantial factor in bringing about the plaintiff's harm. (*Nola M.*, *supra*, 16 Cal.App.4th at p. 427.) It emphasized that to establish causation, the plaintiff was required to "do more than simply critique a defendant's security measures or compare them to some abstract standard espoused by the plaintiff's security expert"; rather, the

plaintiff was required to show that her injuries were caused by the defendant university's failure to take additional security measures. (*Id.* at p. 435.) The *Nola M.* court reasoned that a more lenient standard of causation would make a landowner the insurer of the safety of persons entering the premises: "We think it comes down to this: When an injury can be prevented by a lock or a fence or a chain across a driveway or some other physical device, a landowner's failure to erect an appropriate barrier can be the legal cause of an injury inflicted by the negligent or criminal act of a third person. [Citations.] But where, as here, we are presented with an open area which could be fully protected, if at all, only by a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented. [Citation.] [¶] Otherwise, where do we draw the line? How many guards are enough? . . . How much light is sufficient? . . . Are plants of any kind permissible . . . ? . . . Does every shop, every store, every manufacturing plant, have to be patrolled by private guards hired by the owner? Does a landowner have to effectively close his property and prevent its use altogether? [Citation.] To characterize a landowner's failure to deter the wanton, mindless acts of violence of a third person as the 'cause' of the victim's injuries is (on these facts) to make the landowner the insurer of the absolute safety of everyone who enters the premises." (*Id.* at pp. 436-437, fn. omitted.)

### 4. *Noble v. Los Angeles Dodgers, Inc.*

In *Noble*, *supra*, 168 Cal.App.3d at page 914, a fan assaulted by a third person after a game in the stadium parking lot sued the owner of Dodgers Stadium for failing to provide adequate security allegedly resulting in his injuries. The fan's spouse also sued based on her having witnessed the incident. (*Ibid.*) The owner appealed from a judgment entered on a jury verdict in the plaintiffs' favor. (*Ibid.*) The appellate court reversed. It initially observed that while "[a] landowner is not an insurer of the safety of persons on his [or her] property[, he or she] does . . . have a duty to take reasonable steps to protect invitees from *foreseeable* injury even to the extent of controlling the conduct of third

22

parties.  [Citations.]"  (*Ibid.*, original italics.)  The court determined that causation was the critical inquiry in resolving the appeal.  (*Id.* at p. 917.)  Acknowledging evidence that there had been reported fights at less than 10 percent of the previous 66 night games, the *Noble* court concluded it did not need to discuss the extent of the owner's duty to protect the plaintiffs due to this history because "[the p]laintiffs offered no evidence that there were any *reasonable* steps which the Dodgers could have taken to prevent it or that inaction on the part of the Dodgers in any way caused [the] plaintiffs' injuries."  (*Id.* at p. 915, original italics.)

The appellate court rejected the notion that a property owner could be held liable for injuries caused by a third party's criminal conduct simply on the basis that the owner had "fail[ed] to provide an adequate deterrence to criminal conduct in general."  (*Noble*, *supra*, 168 Cal.App.3d at p. 916.)  And although the plaintiffs' expert opined that the defendant's security efforts were inadequate and the defendant should have employed seven more people and deployed the personnel in a different fashion, he did not testify that these improvements would have prevented the occurrence of the incident.  (*Id.* at p. 917.)  The *Noble* court concluded therefore that the plaintiffs' negligence claim failed due to the absence of evidence of causation.  (*Id.* at p. 918.)  It summed up its views as follows:  "The present case is a classic example of a plaintiff establishing what could be described as abstract negligence, in the context that the Dodgers' security didn't comport with [the] plaintiffs' expert's or the jury's notion of 'adequacy,' but failing to prove any causal connection between that negligence and the injury."  (*Ibid.*)

### 5.    *Constance B. v. State of California*

In *Constance B. v. State of California* (1986) 178 Cal.App.3d 200, 204 (*Constance B.*), the plaintiff was physically and sexually assaulted late at night in a bathroom at a rest stop off a state highway.  She sued the State, claiming negligence in its failure to provide adequate lighting, patrolling, and maintenance of the area.  (*Ibid.*)  The trial court granted the defendant's motion for summary judgment, notwithstanding

23

the opinion of the plaintiff's security consultant that "placement of the restroom facilities at the Dunnigan rest stop present[ed] 'obvious and serious security risks for users. . . .' " (*Id.* at p. 205.) The Court of Appeal affirmed. Rejecting, among other theories, the plaintiff's contention that the state could be held liable for causing her injuries because of inadequate lighting, the court concluded: "Nor are we persuaded that the matter should go to the jury on the vague supposition that, notwithstanding that the assailant was standing in the light, even brighter lights might have deterred the assault. This theory has nothing to do with the creation of an opportunity to commit crime by providing a place of concealment. . . . If liability may be premised solely on this notion, proprietors will become the insurers of the safety of persons on their premises, subject only to the caprice of particular juries. [Citation.] If we are unwilling as a matter of policy to insure against losses occasioned by crimes, we ought not foist that burden haphazardly on persons not at fault for criminal misbehavior." (*Id.* at p. 212.)

### 6. *Sharon P. v. Arman, Ltd.*

In *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1185 (*Sharon P.*),[12] the plaintiff sued the owner and operator of a commercial garage for negligence in failing to provide adequate security after she was sexually assaulted at gunpoint by an unknown assailant. After a defense summary judgment motion was granted and the Court of Appeal reversed (*id.* at pp. 1187-1188), the Supreme Court reversed the Court of Appeal and remanded with directions that the trial court enter judgment in favor of the defendants (*id.* at p. 1199). Although the high court's focal point was duty—specifically, whether the defendants owed a duty to provide security for the garage notwithstanding the absence of prior similar instances of criminal conduct or violence—it observed that "it is questionable whether [the] plaintiff's proposed measures [adequate lighting,

---

[12] *Sharon P.*, *supra*, 21 Cal.4th 1181 was later disapproved by the Supreme Court on grounds not related to the issues for which *Sharon P.* is cited in the present appeal. (See *Aguilar*, *supra*, 25 Cal.4th at p. 853, fn. 19.)

operational security cameras, patrolling personnel] would have been effective to protect against the type of violent assault that occurred here." (*Id.* at p. 1196.) Further, the Supreme Court highlighted the fact that other courts of appeal had "rejected claims of abstract negligence pertaining to the lighting and maintenance of property where no connection to the alleged injuries was shown. [Citations.]" (*Id.* at pp. 1196-1197, fn. omitted.)[13]

### E. Summary Judgment in Defendants' Favor Was Proper

Landmark based its motion on a three-pronged approach that plaintiffs could not establish duty, breach of duty, or that any assumed breach of duty was a substantial factor in causing Stokes's injuries.[14] Although Stadium Management addressed below that there was no evidence of breach of duty, the focus of its motion for summary judgment was that its alleged breach of duty was not the cause of Stokes's injuries. Because we conclude that both defendants demonstrated that any alleged breach of their respective duties to provide adequate security to Stadium patrons was not a substantial factor resulting in the injuries to Stokes, and the plaintiffs failed to present responsive evidence supporting causation, we need not address the remaining negligence elements. (See, e.g., *Saelzler*, *supra*, 25 Cal.4th at p. 772; *Leslie G.*, *supra*, 43 Cal.App.4th at p. 481.)[15]

---

[13] In making this observation, the Supreme Court referenced *Nola M.*, *supra*, 16 Cal.App.4th 421, *Constance B.*, *supra*, 178 Cal.App.3d 200, and *Noble*, *supra*, 168 Cal.App.3d 912. (See *Sharon P.*, *supra*, 21 Cal.4th at pp. 1196-1197.)

[14] Landmark also contended below that the second cause of action for premises liability failed because it did not own, lease, occupy or control the property where Stokes was injured. Landmark renews this argument on appeal. Because we conclude that plaintiffs cannot show the element of causation—an element required for a premises liability claim (see *Castellon*, *supra*, 220 Cal.App.4th at p. 998)—we need not decide this question here. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845, fn. 5 [appellate courts will not address issues when their resolution is unnecessary to the disposition of the appeal].)

[15] The motions for summary judgment share for the most part common facts, and (continued)

### 1. *Relevant Facts*

There were at least 923 security personnel working the 49ers game on October 7, 2018, attended by 53,582 fans. Landmark deployed 528 security personnel for the game, including 64 off-duty peace officers (26 posted to patrol the parking lots on bikes). Landmark assigned 30 roaming personnel to the particular lot where the incident occurred, including 6 off-duty peace officers on bikes and 24 uniformed Landmark security personnel, who maintained radio contact with the Stadium Command Center.

The Stokes group and the Gonzales group separately attended the game. There were no interactions between the two groups before the postgame incident. The Gonzales group left the stadium before the game ended, returned to Gonzales's car, and began packing up to leave. Gonzales opened a beer while the group waited for Erica Castro to return from the restroom; Gonzales consumed several ounces of beer before the incident occurred.[16]

The Stokes group left the Stadium at about 4:35 p.m., and they walked back toward Martin's truck. As he neared the Gonzales group, Stokes kicked an empty glass bottle, which struck the side of Gonzales's car. Stokes approached the car and Gonzales rushed toward Stokes and immediately punched Stokes in the face; Stokes fell back to the

---

the principles of causation apply equally to the two defendants. Accordingly, it is unnecessary to include a separate discussion of the two motions here as to whether there was a triable issue of fact supporting causation.

[16] Plaintiffs dispute that after returning after the game, the Gonzales group was packing up to leave the Stadium. Instead, they characterize the group's actions as "loitering" and "tailgating," and plaintiffs assert that under Stadium rules, post-kickoff tailgating and loitering in the parking lots are prohibited and may subject the fan to ejection. The record is unclear as to the amount of time that elapsed between the Gonzales group's return to Gonzales's car and the occurrence of the incident. As discussed, *post*, we conclude that any alleged security lapse in defendants' failing to locate and eject Gonzales due to possible tailgating, loitering, or beer-drinking was not a substantial factor in causing Stokes's injury. Accordingly, whether the Gonzales group was tailgating or loitering after the game, or merely packing up to leave, is immaterial to the disposition of this appeal.

pavement. After Stokes got to his feet, Gonzales immediately punched him again in the face; Stokes fell back, striking his head on the pavement and lay still. Before punching Stokes, Gonzales did not look around the area to see if police or security were in the vicinity.

The entire encounter occurred within approximately nine seconds, and only four seconds elapsed between Gonzales's first punch and second punch. The incident happened quickly and there was no chance for anyone to intervene. Gonzales drove away slightly over three minutes later.

### 2. *Absence of Causation*

Defendants in this case, undertaking the responsibility to provide security for the largescale event here—the professional football game of October 7, 2018, held at Levi's Stadium—could certainly incur liability for negligence resulting in a fan's injuries caused by a third-party assault. The fact that the third party directly caused the injury through a criminal act does not constitute a superseding cause that *necessarily absolves* the defendants of liability for their own negligence. (See *Leslie G.*, *supra*, 43 Cal.App.4th at p. 481.) On the other hand, defendants cannot be held liable for "abstract negligence . . . [where plaintiffs] fail[] to prove any causal connection between that negligence and the injury." (*Noble*, *supra*, 168 Cal.App.3d at p. 918.)

The above-described facts support defendants' position that neither of them can be held liable for negligence or premises liability because plaintiffs cannot establish the element of causation. *Saelzler*, *supra*, 25 Cal.4th 763 and the five appellate decisions discussed therein—presented, *ante*—inform and guide our analysis here. In *Saelzler*, *supra*, at pages 775 to 776—as well as in *Leslie G.*, *supra*, 43 Cal.App.4th at page 488— the claims against the defendants-property owners could not be sustained because the evidence did not show that it was more probable than not that their negligent acts or omissions were a substantial factor in causing injuries resulting from third-party assaults. The cases also spoke in similar terms of the plaintiff's inability to show a causal

connection between the defendant's alleged breach of duty and the plaintiff's injury. (See *Saelzler*, *supra*, at pp. 774, 775-776; *Noble*, *supra*, 168 Cal.App.3d at p. 918.) The common themes of these authorities are that a defendant landowner—or, here, a party charged with providing security for a facility—(a) is not an insurer of the safety of invitees against injuries inflicted by third parties, (b) is not responsible for third-party criminal conduct simply due to a failure to provide adequate deterrence of misconduct generally, (c) may be liable for negligent security efforts only if they were a substantial factor in causing the injury to the plaintiff inflicted by a third party, and (d) may be found to have caused the harm only if such causality is proved by substantial, nonspeculative evidence that a causal connection between the defendant's negligence and the plaintiff's injury is more probable than not. Applying these principles here, the evidence did not show that it was more probable than not that there was a causal connection between defendants' alleged breach of duty and Stokes's injury. Three additional cases are supportive of our conclusion.

In *Romero v. Los Angeles Rams* (2023) 91 Cal.App.5th 562, 564 (*Romero*), a fan and his family sued a professional sports franchise, a security firm, and the stadium owner for injuries he incurred after being assaulted by other fans at the Los Angeles Memorial Coliseum at the end of a Los Angeles Rams football game. Summary judgment was granted in favor of the defendants on the ground that no causation had been shown, and the appellate court affirmed. (*Id.* at pp. 565.) After assuming (as did the trial court) duty and breach, the *Romero* court concluded that there was no triable issue of fact concerning causation. (*Id.* at pp. 571-575.) Addressing one of the plaintiffs' arguments involving causation—that the defendants should have trained security to enforce a fan code of conduct, including the ejection of fans if necessary—the appellate court held: "This is in effect a claim that [the security firm] should have provided additional security personnel. . . . [T]he bare claim that more security personnel could have prevented a criminal attack shows only 'abstract negligence.' [Citation.] There

must be direct or circumstantial evidence showing that the assailant took advantage of the defendant's lapse or omission 'in the course of committing his attack, and that the omission was a substantial factor in causing the injury.' [Citation.] When the claimed lapse or omission is insufficient security personnel, this can be a difficult burden to meet because ' "[n]o one can reasonably contend that even a significant increase in police personnel will prevent all crime or any particular crime." ' [Citations.] '[A]ssaults and other crimes can occur despite the maintenance of the highest level of security.' [Citation.]" (*Id.* at p. 572.)

*Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352 (*Thompson*) involved an injury resulting from a fight that happened quickly and was not detected by authorities at the facility. In *Thompson*, after a minor was injured due to being punched by a fellow student, he and his parents sued a school district for alleged negligence in failing to supervise students. (*Id*. at p. 1357.) The assailant had threatened to assault another student the previous day and had also been suspected of setting fire to a poster. (*Ibid.*) The trial court granted summary judgment in favor of the district, which was affirmed on appeal. (*Id.* at pp. 1357-1358.) The events resulting in the plaintiff's injury occurred quickly and involved the assailant and another who had plotted to rob the plaintiff. (*Id.* at p. 1372.) The appellate court concluded that the plaintiffs could not show that the district's acts or omissions in preventing the assault were a substantial factor causing the plaintiff's injury: "Short of a prison-like lockdown situation, students who, for their own purposes, deliberately intend to escape the direct scrutiny of supervisory personnel will inevitably find a way to do so. [Citation.] When, in such a case, *an injury occurs with such rapidity that supervisorial personnel could have no opportunity to discover and respond to the situation, then claims of abstract negligence will not support recovery.* [¶] We must reject appellants' suggestion that the mere fact a fight occurred is sufficient, in itself, to establish actionable negligence. [Citation.]

29

Where, as here, a claim of ineffective supervision is not supported by competent proof of causation, summary judgment is appropriate. [Citation.]" (*Ibid.*, italics added.)

And *Rinehart v. Boys & Girls Club of Chula Vista* (2005) 133 Cal.App.4th 419 (*Rinehart*) supports the conclusion that causation cannot be shown where the defendant lacks the ability to intervene to prevent a sudden and unforeseen third-party assault. There, a minor participating in an after-school program operated by a boys and girls club was injured on a playground by a rock thrown by a nonmember on a hillside above the playground. (*Id.* at p. 424.) There was a public park situated above the playground with a fence dividing the area with the park on one side and the hillside and playground below on the other side. (*Id.* at pp. 424-425.) In response to the defendant's motion for summary judgment, the plaintiff relied on, inter alia, the declaration of an expert who opined: The defendant "had 'failed to provide adequate and effective barriers, both physical and administrative, to prevent the subject incident' . . . [and] that the physical presence of a supervisor would have served as a deterrent to aggressive behavior of both members of the Club and nonmembers and that [the defendant] failed to provide continual supervision as required by its own stated policies and by state law regulating child care facilities." (*Id.* at p. 426.) The trial court granted the defendant's motion, disposing of the negligence and premises liability claims, concluding, inter alia, that there was no evidence of causation. (*Id.* at pp. 423, 427.) In affirming the judgment, the *Rinehart* court, on the issue of causation, held: "[The plaintiff] has not shown that additional supervision or more effective supervision and upkeep of the Club's fence would have prevented the incident. . . . Because [the defendant] does not have a statutory duty to have one-on-one supervision at all times, it is pure speculation that a supervisor closer to where [the plaintiff] was on the playground or who made rounds of the playground or the fenced property more frequently would have prevented what appears to be a criminal act by an unknown assailant. . . . Aside from the increased expense of providing additional supervisors and fence repairs, it is entirely conjecture

that such added personnel and repairs if needed would prevent all assaults or negligent acts which can occur despite the highest level of supervision.  [Citation.]  [¶]  [The plaintiff] simply has not shown, and cannot prove any omission by [the defendant] in its supervision or upkeep of its premises was a 'substantial factor' in causing his injuries.  [Citations.]" (*Id.* at p. 435.)

The evidence in the record here does not establish that the acts or omissions of either defendant were a substantial factor in causing the injuries to Stokes.  Prior to the act (i.e., Stokes's kicking the bottle) that triggered the assault, there was nothing to suggest that the violent event would occur.  There had been no prior interactions between Stokes and Gonzales.  And there is no indication that Gonzales or Stokes had done anything prior to the incident to call attention to themselves with security.  Moreover, as demonstrated in the security video offered by defendants in their respective motions, the incident was sudden, unexpected, and occurred quickly—within approximately nine seconds.  Consistent with how suddenly and quickly the incident occurred, the witnesses from both groups—Martin and Garcia from the Stokes group and Rodriguez, Erica Castro, and Alma Castro from the Rodriguez group—uniformly testified in their depositions that the assault occurred so quickly that it was not possible to intervene.

Defendants demonstrated that plaintiffs could not show "that it was *more probable than not* that, but for [defendants' alleged] negligence, the assault [upon Stokes] would not have occurred." (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 488, italics added.)  Because " '[a] mere possibility of such causation is not enough' " (*Saelzler*, *supra*, 25 Cal.4th at p. 775), defendants established that summary judgment was proper because of the absence of this critical element of negligence.  We will next address two cases upon which plaintiffs rely—*Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586 (*Janice H.*), and *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284 (*Mukthar*)—and plaintiffs' theories of causation, which are explained by their security expert.

31

### 3.    *Plaintiffs' Authorities*

Plaintiffs cite two cases, *Janice H.*, *supra*, 1 Cal.App.5th 586, and *Mukthar*, *supra*, 139 Cal.App.4th 284, in support of their position that there was a triable issue of material fact that defendants alleged acts or omissions were a substantial factor in causing Stokes's injuries.  Neither case assists plaintiffs' position.

In *Janice H.*, *supra*, 1 Cal.App.5th at page 589, the plaintiff sued a bar and dance club for negligence after she was raped by an employee in a stall of its unisex bathroom. The club, which "fostered a sexually charged atmosphere by permitting bartenders to wear nothing but underwear," employed as many as 12 security personnel.  (*Id.* at p. 590.)  One or two guards were posted in the bathroom area to prevent sexual activity, drug use, and conflicts, and they were instructed to prevent more than one person from entering a particular stall and to intervene if that occurred.  (*Ibid.*)  Those security persons were given the discretion to leave their posts to patrol the club when attendance was low. (*Id.* at p. 591.)  When the assault occurred, there were no security guards posted near the bathroom.  (*Ibid.*)  Plaintiff was awarded $5.42 million in a jury verdict on her claim for premises liability against the defendant club.  (*Id.* at p. 592.)  The appellate court affirmed.  After concluding that the club owed patrons a duty of reasonable care in securing the restrooms and it breached that duty (*id.* at pp. 593-597), it held that there was substantial evidence that the club's negligence was a substantial factor in causing the plaintiff's damage (*id.* at p. 598).  In so holding, the court in *Janice H.* rejected the defendant's claim that causation was speculative (*id.* at p. 598), holding that the jury "could reasonably infer that the presence of a security guard in the restroom area would have deterred [the assailant's] sexual assault, particularly because the security guards worked with [the assailant], knew who he was, and were aware of the policies against [employees having] sexual contact with patrons" (*id.* at p. 599).

32

*Janice H.* does not support plaintiffs' position. The facts there were very different from the case before us.[17] In *Janice H.*, the defendant club required that security be posted to guard a small area to address the specific problem of multiple persons entering bathroom stalls. Since such a finite area was involved, patrons would easily be aware of security's presence. Here, the evidence is that defendants deployed roving uniformed security and off-duty peace officers over the parking lots of the Stadium. The analogous equivalent here—which would be infeasible and beyond burdensome—would be to have a stationary security person posted for every few hundred square feet of a large parking lot. In *Janice H.*, the evidence was sufficient for a trier of fact to have concluded that the lapse in security in failing to guard a discrete designated area was a substantial factor resulting in the plaintiff's injury. Here, there was no substantial evidence from which a trier of fact could conclude that defendants caused the harm.

*Mukthar*, *supra*, 139 Cal.App.4th 284 concerned a convenience store employee's claim for negligence against a security company after he was assaulted by a patron at the front door when he was attempting to prevent the patron and two others from shoplifting. (*Id.* at pp. 286-287.) The store manager had hired a private security firm to provide uniformed security guards from 9:00 p.m. to 5:00 a.m., but no guard was present at the time of the incident. (*Id.* at p. 287.) The trial court granted the defendant's motion for summary judgment on the basis that the plaintiff could not establish that his injuries were caused by the security company. (*Id.* at p. 286.) The appellate court reversed, concluding that there was a question of fact as to whether the security company caused plaintiff's injuries. (*Ibid.*) After noting that the defendant did "not claim that there was a good reason why its guard was not on the premises when the assault" occurred (*id.* at p.

---

[17] The procedural history of the two cases is also dissimilar. *Janice H.*, *supra*, 1 Cal.App.5th at page 592 was decided by a judgment entered in favor of plaintiff after a multimillion dollar jury verdict, while the present case was decided in favor of defendants through summary judgment before trial.

290), the *Mukthar* court held that the critical issue was "whether that assault would, or would not, have taken place if [the security guard] had been standing in his usual position, which was one foot away from the door, i.e., in very close proximity to [the plaintiff] when he was struck. In other words, the focus in this case . . . [is] whether [the defendant's] failure to exercise reasonable care resulted in physical harm to [the plaintiff]." (*Id.* at p. 291.)

*Mukthar* does not support the plaintiffs' position in this case. As was true with *Janice H.*, the facts in *Mukthar* are very different from the facts here. In *Mukthar*, the employee of the defendant security company was charged with guarding *the precise space* (front door of the convenience store) where the assault occurred, a space where the guard would be obviously visible to a potential assailant. Here, security personnel were charged with roaming a large parking lot watching over large numbers of people at any given time.

Contrary to plaintiffs' assertions, neither *Janice H.* nor *Mukthar* offers any support for the position that there was a triable issue of fact concerning whether defendants' acts or omissions were a substantial factor in the resulting injury to Stokes.

### 4. *Plaintiffs' Causation Theories*

Plaintiffs assert two alternative theories in support of their claim that the defendants' acts or omissions caused Stokes's injury; their counsel has termed these causation arguments as the "ejection theory" and the "deterrence theory."[18] Plaintiffs assert as a first theory that, had there been a security presence in the parking lot in the vicinity of Gonzales's vehicle between the time he and his friends arrived there after the game and prior to the incident, it is more likely than not that Stokes would not have been

---

[18] Plaintiffs' counsel used this terminology at oral argument. In arguing these theories, counsel expressly stated that plaintiffs' theory of causation was *not* based upon the argument that once the incident began to unfold, security reasonably should have intervened to prevent the assault from occurring.

assaulted. They contend that security would have observed " 'Gonzales and his group loitering, tailgating, and consuming alcohol,' " the group would have been asked to leave, and Gonzales would thus have no longer been in the lot when Stokes arrived where the incident occurred. Plaintiffs, as an alternative theory, posit that had security been present in the vicinity of Gonzales's vehicle after he and his friends arrived after the game, that presence would have deterred Gonzales from assaulting Stokes. These theories are conjecture and speculation, not substantial evidence that defendants' claimed breach of duty in supplying adequate security was a substantial factor in causing the harm to Stokes. (See *Leslie G.*, *supra*, 43 Cal.App.4th at p. 484.)

Under plaintiffs' ejection theory: (a) *if* security had patrolled the specific area in the vast parking lot where Gonzales was parked, (b) and *if* security had done so at the particular time Gonzales was there drinking part of a beer while waiting for Erica Castro to return from the restroom, (c) and *if* security had actually observed Gonzales drinking at the time, (d) and *if* security, based upon its observations, had concluded that the Gonzales group was loitering as opposed to getting ready to leave, (e) and *if* security had instructed Gonzales to immediately exit the lot (as opposed to having instructed him to dispose of the beer or less urgently having advised him that he should get ready to leave), (f) and *if* Gonzales had *promptly* heeded this (assumed) directive by security and had proceeded with some urgency to leave the parking area with his group, (g) and *if* there had been sufficient time between security's directive and Gonzales's being able to promptly leave the parking area (i.e., before 4:51 p.m.), *then* Gonzales's assault of Stokes would not have occurred. Plainly, this theory is speculation heaped upon speculation; it is not based upon evidence that is " 'substantial.' " (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 484.) It assuredly does *not* represent "evidence establishing that *it was more probable than not that*, but for [defendants'] negligence, the assault would not have occurred." (*Id.* at p. 488, italics added; see also *Saelzler*, *supra*, 25 Cal.4th at p. 776 [if " 'the probabilities

35

[of causation] are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant*' "].)

Under their alternative deterrence theory, plaintiffs contend that if there had been an actual presence of security personnel in the parking lot of which Gonzales had been aware before the incident, he would not have assaulted Stokes. Plaintiffs assert that it can be reasonably inferred from the record that there was *no security* deployed in the parking lot at the time of the incident—based upon: (a) deposition testimony from members of the Gonzales group that they did not see security in the lot after the game; (b) Martin's testimony that he looked unsuccessfully for security after the assault; and (c) a claimed delay of approximately seven minutes before security arrived at the scene of the incident. Given the direct evidence presented by defendants (described above) of assigned security personnel to the parking lots and to the particular lot where the incident occurred, including evidence of the specific persons so assigned, it cannot be reasonably inferred from the largely anecdotal evidence upon which plaintiffs rely that there was no security deployed at all in the parking lot. (See *Aguilar*, *supra*, 25 Cal.4th at p. 857 [inference that opponent of summary judgment argues may be drawn from evidence must be a reasonable one].) Further, even assuming arguendo that it may be reasonably inferred from plaintiffs' evidence that security was absent from the parking lot, plaintiffs' deterrence theory would be that: (a) *if* security had patrolled the specific area in the vast parking lot where Gonzales was parked, (b) *and if* security had done so shortly before or during the particular time that the Gonzales group arrived after leaving the Stadium and while they were getting ready to leave, (c) *and if* Gonzales had actually observed security patrolling the area at the time, (d) *and if* Gonzales had thought about having seen security during the split second in which he reacted impulsively to Stokes's having kicked a bottle into Gonzales's vehicle, *then* Gonzales *might have been deterred* from taking the swift and violent reaction of assaulting Stokes. This theory, likewise, is based upon conjecture or speculation, rather than upon evidence that is substantial. (Cf. *Noble*, *supra*, 168

Cal.App.3d at p. 916 [property owner not liable for third-party criminal behavior simply because he or she "fail[ed] to provide an adequate deterrence to criminal conduct in general"].) The theory that security presence would have deterred Gonzales from committing the assault is not based upon "evidence establishing that *it was more probable than not* that, but for [defendants'] negligence, the assault would not have occurred." (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 488, italics added.)

Plaintiffs contend that the opinions of their security expert, Fried, in his declaration in opposition to the motions support the position that there was a triable issue of fact as to whether defendants acts or omissions were a substantial factor in causing Stokes's injury. Plaintiffs argue in their opening brief that the following two opinions offered by Fried support their causation theories: (1) "If defendants had followed their 'policies' and ejected the Gonzales group when they opened a beer and hung out after the game, it is 'more likely than not' that Gonzales would not have assaulted Stokes—he would have been gone"; and (2) "If defendants had provided 'highly visible security' (as they were supposed to) it is 'more likely than not' that Gonzales 'would have been deterred from violence knowing security was in the area.' " Plaintiffs argue that the trial court erred in rejecting this opinion evidence as being " 'speculative.' "

For the reasons we have discussed above, we agree with the trial court that the two Fried opinions offered in support of plaintiffs' causation theories were entirely speculative and were properly disregarded. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 [" 'an expert opinion based on speculation or conjecture is inadmissible' "].) "[A]n expert's uncorroborated speculation is insufficient to establish causation." (*Leslie G.*, *supra*, 43 Cal.App.4th at p. 476.) It is not uncommon for courts to reject opinion testimony from security experts on the ground that it is speculative. (See, e.g., *Saelzler*, *supra*, 25 Cal.4th at p. 776; *Leslie G.*, *supra*, at p. 488; *Nola M.*, *supra*, 16 Cal.App.4th at p. 427; *Constance B.*, *supra*, 178 Cal.App.3d at pp. 211-212; *Noble*, *supra*, 168 Cal.App.3d at pp. 916-917.) As stated by the court in

*Leslie G.*, "Where . . . there is evidence that the assault could have occurred even in the absence of the landlord's [here, security's] negligence, proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture." (*Leslie G., supra*, at p. 488.)[19]

### III.   DISPOSITION

The judgment of October 10, 2022, entered in favor of Landmark Event Staffing Services, Inc. is affirmed.  The judgment of October 17, 2022, entered in favor of Forty Niners Stadium Management Co. LLC is affirmed.  Respondents shall recover their respective costs on appeal.

---

[19] Plaintiffs also contend that the trial court erred in sustaining Landmark's objections to the entirety of the Fried declaration.  Landmark responds that plaintiffs waived their argument that the court erred in this evidentiary ruling by failing to provide legal authority in support of their position.  Irrespective of whether plaintiffs waived their challenge, we have considered the Fried declaration in connection with both defense summary judgment motions.

_____
                                          BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*Stokes et al. v. Forty Niners Stadium Management Company LLC et al.*
**H050639**

Filed 1/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BROOKE STOKES et al., | H050639 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 19CV357748) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| FORTY NINERS STADIUM MANAGEMENT CO., LLC, et al., | |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on December 19, 2024, was not certified for publication in the Official Reports. The Association of Southern California Defense Counsel, respondent Landmark Event Staffing Services, Inc., and respondent Forty Niners Stadium Management Co., LLC have requested the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

BAMATTRE-MANOUKIAN, ACTING P. J.

DANNER, J.

WILSON, J.

*Stokes et al. v. Forty Niners Stadium Management Company LLC et al.*
H050639

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 19CV357748 |
| Trial Judge: | Hon. Drew C. Takaichi |
| Attorneys for Plaintiffs and Appellants:<br>Brooke Stokes<br>Cheyenne Stokes<br>Jessica Flores | Ted William Pelletier<br>Law Office of Ted Pelletier<br><br>Thomas Alan Paoli |
| Attorneys for Defendant and Respondent:<br>Forty Niners Stadium Company LCC | William Noel Edlin<br>Andrew D. Perez<br>Edlin Gallagher Huie + Blum |
| Attorneys for Defendant and Respondent:<br>Landmark Event Staffing Services, Inc | Laura E. Malkofsky<br>Foran Glennon |

*Stokes et al. v. Forty Niners Stadium Management Company LLC et al.*
**H050639**